[No. D038051. Second Dist., Div. One. June 11, 2002.]

PARK MEDICAL PHARMACY, Plaintiff and Appellant, v.
SAN DIEGO ORTHOPEDIC ASSOCIATES MEDICAL GROUP, INC.,
Defendant and Respondent.

248

## COUNSEL

Fredrickson, Mazeika & Grant, Dennis W. Fredrickson, Peter S. Gregorovic, John A. Cronin and Shari I. Weintraub for Plaintiff and Appellant.

Foley & Lardner, R. Michael Scarano and Susanne C. Washington for Defendant and Respondent.

Catherine I. Hanson and Astrid G. Meghrigian for California Medical Association as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**KREMER, P. J.**—Park Medical Pharmacy (Park Medical) appeals a grant of summary judgment favoring defendant San Diego Orthopedic Associates Medical Group, Inc. (the Medical Group) on Park Medical's complaint that the Medical Group was dispensing drugs in violation of the Business and Profession Code's prohibition against physicians' keeping a pharmacy. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The Medical Group and its physicians are located in the Mercy Medical Building. The physicians of the Medical Group individually dispense drugs on a for-profit basis to their workers' compensation patients. When a workers' compensation patient first registers with the Medical Group, he or she is given a form entitled "Worker's Compensation Dispensing Disclosure." This form tells the patient that a Medical Group physician can dispense some prescribed medications and that the patient has a choice of between obtaining the medications from the Medical Group physician or obtaining a prescription that may be filled at the pharmacy of the patient's choice. The Medical Group keeps drugs in a secure area called the "Physician Dispensing Unit." Each physician is required to individually purchase drugs and to stock his or her drugs separately from the other physicians.

Park Medical operates a pharmacy in the Mercy Medical Building.

In September 2000, Park Medical filed a complaint against the Medical Group, alleging that the Medical Group was dispensing drugs in violation of the Business and Professions Code[1] and were unlawfully operating a retail pharmacy because the Medical Group was dispensing drugs on a for-profit basis. Park Medical alleged its retail prescription sales to the Medical Group's patients had declined after the Medical Group began dispensing drugs directly to its patients. Park Medical also alleged that as a result of dispensing drugs to its patients, the Medical Group had "significantly interfered with [Park Medical's] ability to conduct a viable, on-going, business by diverting patients away from [their pharmacy]." Park Medical included causes of action for violations of sections 4170 (authorizing physician dispensing) and 17000 (unfair business practices) and intentional or negligent interference with prospective economic advantage. Park Medical sought declaratory and injunctive relief.

The Medical Group brought a motion for summary judgment contending that, as a matter of law, the Medical Group was not violating the Business and Professions Code because the code allowed physicians to dispense drugs directly to their patients on a for-profit basis.[2] The court framed the issue as "whether the act of dispensing medications by [the Medical Group] to its patients for profit constitutes keeping 'a pharmacy' within the meaning of subdivision (3) of section 4170." The court granted summary judgment, concluding that dispensing drugs on a for-profit basis did not mean the Medical Group was keeping a pharmacy.

### DISCUSSION

■ Park Medical contends the Medical Group, by dispensing drugs to its patients on a for-profit basis, has violated section 4170, subdivision (a)(3), which prohibits physicians from keeping a pharmacy for the retailing of dangerous drugs. We are thus presented with an issue of statutory interpretation.

■ "Our fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute." (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d

---

[1]All statutory references are to the Business and Professions Code unless otherwise specified.

[2]Subsequently, Park Medical also motioned for summary judgment, contending that, as a matter of law, the Medical Group was unlawfully dispensing drugs on a for-profit basis. The hearing on this summary judgment was scheduled after the Medical Group's summary judgment and was mooted by the court's granting summary judgment in favor of the Medical Group.

1196]; *Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 977 [90 Cal.Rptr.2d 260, 987 P.2d 727].) "We begin by examining the statutory language, giving the words their usual and ordinary meaning." (*Day*, at p. 272; *People v. Lawrence* (2000) 24 Cal.4th 219, 230 [99 Cal.Rptr.2d 570, 6 P.3d 228].) If the language of a statute is clear, we must follow its plain meaning. (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1003 [111 Cal.Rptr.2d 564, 30 P.3d 57].) "If, however, the language is susceptible to more than one reasonable interpretation, then we look to 'extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' " (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519 [106 Cal.Rptr.2d 548, 22 P.3d 324]; *Spanish Speaking Citizens' Foundation, Inc. v. Low* (2000) 85 Cal.App.4th 1179, 1214 [103 Cal.Rptr.2d 75] ["While the ' "final responsibility for the interpretation of the law rests with the courts" ' [citation], 'the construction of a statute by officials charged with its administration . . . is entitled to great weight.' "].) " '[W]e do not construe statutes in isolation, but rather read every statute "with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness." [Citation.]' " (*Horwich v. Superior Court* (1999) 21 Cal.4th 272, 276 [87 Cal.Rptr.2d 222, 980 P.2d 927].)

■■■ The Business and Professions Code contains a comprehensive scheme, the Pharmacy Law, that regulates the dispensing of dangerous drugs, i.e., prescription medications. (§ 4000 et seq.) Article 12 of the Pharmacy Law (§§ 4170-4175) addresses when a physician may dispense drugs. Section 4170, which is at issue in this case, sets out conditions imposed on a physician (a "prescriber") who dispenses drugs to his or her patients:

"(a) No prescriber shall dispense drugs or dangerous devices to patients in his or her office or place of practice unless all of the following conditions are met:

"(1) The dangerous drugs or dangerous devices are dispensed to the prescriber's own patient, and the drugs or dangerous devices are not furnished by a nurse or physician attendant.

"(2) The dangerous drugs or dangerous devices are necessary in the treatment of the condition for which the prescriber is attending the patient.

"(3) *The prescriber does not keep a pharmacy, open shop, or drugstore, advertised or otherwise, for the retailing of dangerous drugs, dangerous devices, or poisons.*

"(4) The prescriber fulfills all of the labeling requirements . . . , all of the recordkeeping requirements of this chapter, and all of the packaging requirements of good pharmaceutical practice, including the use of child-proof containers.

"(5) The prescriber does not use a dispensing device unless he or she personally owns the device and the contents of the device, and personally dispenses the dangerous drugs or dangerous devices to the patient packaged, labeled, and recorded in accordance with paragraph (4).

"(6) The prescriber, prior to dispensing, offers to give a written prescription to the patient that the patient may elect to have filled by the prescriber or by any pharmacy.

"(7) The prescriber provides the patient with written disclosure that the patient has a choice between obtaining the prescription from the dispensing prescriber or obtaining the prescription at a pharmacy of the patient's choice.

"(8) A certified nurse-midwife who functions pursuant to a standardized procedure or protocol described in Section 2746.51, a nurse practitioner who functions pursuant to a standardized procedure described in Section 2836.1, or protocol, or a physician assistant who functions pursuant to Section 3502.1, may hand to a patient of the supervising physician and surgeon a properly labeled prescription drug prepackaged by a physician and surgeon, a manufacturer as defined in this chapter, or a pharmacist.

"(b) The Medical Board of California, the State Board of Optometry, the Dental Board of California, the Osteopathic Medical Board of California, the Board of Registered Nursing, and the Physician Assistant Committee shall have authority with the California State Board of Pharmacy to ensure compliance with this section, and those boards are specifically charged with the enforcement of this chapter with respect to their respective licensees.

"(c) 'Prescriber,' as used in this section, means a person, who holds a physician's and surgeon's certificate, a license to practice optometry, a license to practice dentistry, or a certificate to practice podiatry, and who is duly registered as such by the Medical Board of California, the State Board of Optometry, the Dental Board of California, or the Board of Osteopathic Examiners of this state." (Italics added.)

The Legislature has required that physicians who dispense drugs pursuant to section 4170 must have a secure area to store the drugs. (§ 4172.) The Legislature has also stated that section 4170 does not prohibit a physician

from dispensing a limited quantity of a manufacturer's drug samples to his or her patients so long as the samples are in the original packaging, the physician makes a record in the patient's chart, and does not charge the patient for the drug. (§ 4171, subd. (a).)

Park Medical argues that the Legislature's intent not to allow physicians to dispense drugs to their patients on a for-profit basis is reflected in section 4170, subdivision (a)(3), which conditions a physician's authorization to dispense drugs on the physician not keeping "a pharmacy, open shop, or drugstore, advertised or otherwise, for the retailing of dangerous drugs, dangerous devices, or poisons." Park Medical asserts that the Medical Group physicians are keeping a pharmacy because they have a separate room (the Physician Dispensing Unit) where dangerous drugs are stored, possessed, furnished, sold, and dispensed at retail. Park Medical argues this room falls within section 4037's definition of "pharmacy," which Park Medical asserts includes "any area, place, or premises wherein controlled substances, dangerous drugs, or dangerous devices are furnished, sold, or dispensed at retail."[3]

Initially, we note the Legislature could not have intended that the mere existence of a separate area within a medical office to store, prepare and dispense drugs would constitute keeping a pharmacy since the Legislature has specifically required, as a condition of dispensing drugs to patients, that the physician have a separate, secure area to store the drugs he or she dispenses. (§ 4172.)

Additionally, while section 4037 contains a definition of "pharmacy," the provision relating to dispensing physicians keeping a pharmacy predates the definition contained in section 4037 and represents language essentially unchanged since 1905 when the Legislature first regulated the dispensing of

---

[3]"Pharmacy" is defined in section 4037, in pertinent part, as "an area, place, or premises licensed by the board in which the profession of pharmacy is practiced and where prescriptions are compounded. 'Pharmacy' includes, but is not limited to, any area, place, or premises described in a license issued by the board wherein controlled substances, dangerous drugs, or dangerous devices are stored, possessed, prepared, manufactured, derived, compounded, or repackaged, and from which the controlled substances, dangerous drugs, or dangerous devices are furnished, sold, or dispensed *at retail.*" (Italics added.) Section 4343, which is also relevant to the definition of a pharmacy, provides: "No building shall have upon it or displayed within it or affixed to or used in connection with it a sign bearing the word or words 'Pharmacist,' 'Pharmacy,' 'Apothecary,' 'Drugstore,' 'Druggist,' 'Drugs,' 'Medicine,' 'Medicine Store,' 'Drug Sundries,' 'Remedies,' or any word or words of similar or like import; or the characteristic symbols of pharmacy; or the characteristic prescription sign (Rx) or similar design, unless there is upon or within the building a pharmacy holding a license issued by the board pursuant to Section 4110."

drugs. (Stats. 1905, ch. 406, § 1, p. 535.) In 1905, the Legislature in addressing the ability of licensed pharmacists to dispense drugs, required "[e]very store or shop where drugs, medicines or chemicals are dispensed or sold at retail, or displayed for sale at retail" and that displayed certain signs (such as " 'apothecary' " or " 'pharmacy' ") to have a licensed pharmacist (*id.*, § 1, p. 536), but provided the act did not apply and was not to "interfere with any practitioner of medicine . . . with supplying his own patients, as their physician, and by them employed as such, with such remedies as he may desire, and who does not keep a pharmacy, open shop, or drug-store, advertised or otherwise, for the retailing of medicines or poisons" (*id.*, § 12, p. 541). At that time, there was no statutory definition of the word "pharmacy." In other words, the word "pharmacy" as used in section 4170, subdivision (a)(3) reflected the common usage of the word rather than any technical statutory definition.

The common definitions of the word "pharmacy" include not only a place where drugs are compounded and dispensed, but are also synonymous with the word "drugstore."[4] A "drug-store" as commonly understood means "[a] pharmacy or chemist's shop, often also dealing extensively or mainly in other articles, as toilet requisites, stationery, magazines and newspapers, light refreshments, etc." (Oxford English Dict., *supra*, <http://oed.com> [as of Jun. 11, 2002].) Under common usage, the words "pharmacy" and "drugstore" connote a place where drugs are sold to the general public pursuant to a physician's prescription as well as a place where other items are sold to the general public.

When viewed in context, it is apparent the Legislature's concern in prohibiting physicians from keeping a pharmacy was not to prohibit physicians from selling particular unregulated items (such as toothpaste and soap). ▆▆▆ Rather, the Legislature's intent in stating that physicians could not keep a "pharmacy, open shop, or drugstore" (§ 4170, subd. (a)(3)) was to prohibit physicians from having a store, shop or similar place where they sold drugs to the general public, and to limit physicians to dispensing drugs to their own patients for the condition for which the patient was seeking treatment.[5] ▆▆ This conclusion is also consistent with the Legislature's early use of the word "pharmacy," which was defined in terms of "a retail

---

[4]See Oxford English Dictionary (2d ed. 1989) <http://oed.com> (as of Jun. 11, 2002) ("A place where medicines are prepared or dispensed; a drug-store or dispensary") and Webster's Collegiate Dictionary (10th ed. 1999) at page 871 ("DRUGSTORE").

[5]We note that in the current version of the physician dispensing statutes, the language prohibiting physicians from "keep[ing] a pharmacy, open shop, or drugstore . . . for the retailing of dangerous drugs" (§ 4170, subd. (a)(3)) is somewhat redundant in light of other language strictly limiting physicians to dispensing to their own patients for treatment of the

drug store, a pharmacy or drug department" (Stats. 1937, ch. 669, § 1, p. 1861) or as a "store or shop where drugs, medicines or medicinal poisons are dispensed or sold at retail, or displayed for sale at retail" and that displayed certain signs such as " 'druggist,' 'pharmacy,' [or] 'drug store.' " (Stats. 1947, ch. 931, § 12, p. 2149; Stats. 1955, ch. 550, § 3, p. 1030; Stats. 1955, ch. 556, § 4, p. 1060, former Bus. & Prof. Code, § 4035.) Pursuant to these definitions, it is apparent that the Legislature's intent in prohibiting physicians from keeping a pharmacy was to prohibit physicians from dispensing drugs to the general public, i.e., from operating a store or shop where drugs were sold to the general public. Nothing in the language of the statute indicates the Legislature's prohibition on physicians' keeping a pharmacy was intended to address or to limit the profits a physician could make from dispensing drugs to his or her patients.

Park Medical also argues that an intent to prohibit physicians from dispensing drugs on a for-profit basis is demonstrated by the fact that section 4170, subdivision (a)(3) prohibits physicians from "the *retailing* of dangerous drugs, dangerous devices, or poisons." (Italics added.) Park Medical argues: " 'Profit' is inherent in the term 'retail', as evidenced by the definition of 'wholesale price' which is defined as the price paid by the retailer in expectation of obtaining a higher price by way of profit from the resale of the product to the ultimate consumer. ([Black's Law Dict. (5th ed. 1979)] at p. 1432, col. 1.) 'Profit' is the excess of revenues over the expenses of the transaction. (*Id.,* at p. 1090, col. 1.)" Park Medical also relies on the definition of "sale at retail" in Revenue and Taxation Code section 6007:

"A 'retail sale' or 'sale at retail' means a sale for any purpose other than resale in the regular course of business in the form of tangible personal property.

"When tangible personal property is delivered by an owner or former owner thereof, or by a factor or agent of that owner, former owner, or factor to a consumer or to a person for redelivery to a consumer, pursuant to a retail sale made by a retailer not engaged in business in this state, the person

condition for which the patient is consulting the physician (§ 4170, subd. (a)(1) & (2)). While it is true that a construction that renders part of a statute to be surplusage should be avoided (see *Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476 [66 Cal.Rptr.2d 319, 940 P.2d 906]), this rule is not absolute and "the rule against surplusage will be applied only if it results in a *reasonable* reading of the legislation" (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 234-235 [45 Cal.Rptr.2d 207, 902 P.2d 225]). Nothing in the language or legislative history supports the interpretation urged by Park Medical. It appears the "keep[ing] a pharmacy" language is a holdover from the original 1905 version of the law and has been merely carried forward over the years.

making the delivery shall be deemed the retailer of that property. He or she shall include the retail selling price of the property in his or her gross receipts or sales price."

While, obviously, retailers typically hope to make a profit, the term "retailing" does not necessarily require the making of a profit. The term retailing, as commonly understood, means merely to sell in small lots to the ultimate consumer. (See Black's Law Dict. (7th ed. 1999), p. 1317, col. 1; Oxford English Dict., *supra*, <http://oed.com> [as of June 11, 2002].) Retailing is distinguished from wholesaling, which is selling in large lots for resale to consumers. (Black's Law Dict., *supra*, p. 1591, col. 2 [wholesale: "The sale of goods or commodities usu[ally] for resale by a retailer, as opposed to a sale to the ultimate consumer"].)

The Pharmacy Law does not contain a definition of "retail" or "retailing," but does contain a number of sections distinguishing between retailers and wholesalers on the basis of whether the sale is to the ultimate consumer or for resale. (See § 4041 [defining "veterinary food-animal drug retailer"];[6] § 4043 [defining "wholesaler"];[7] § 4180, subd. (a)(1) [regulating who may purchase drugs or dangerous devices "at wholesale"].) It appears to us that "retailing" as used by the Legislature in section 4170, subdivision (a)(3) reflects the common meaning of selling to the ultimate consumer rather than a reference to profit.

Further, when the Legislature began using the word "retail" in connection with the operation of a pharmacy, it was in the context of a "store or shop where drugs . . . are dispensed or sold at retail, or displayed for sale at retail." (Stats. 1947, ch. 931, § 12, p. 2149, former Bus. & Prof. Code, § 4035.) We find nothing in the language of section 4170, subdivision (a)(3), the statutory scheme, or the legislative history that supports a conclusion that the Legislature ever intended nor now intends the term "at retail" to mean a sale for a profit rather than a sale to the general public.

---

[6]Section 4041 defines "veterinary food-animal drug retailer" as "an area, place, or premises, other than a pharmacy, that holds a valid license from the Board of Pharmacy of the State of California as a wholesaler and, in and from which veterinary drugs for food-producing animals are dispensed pursuant to a prescription from a licensed veterinarian. 'Veterinary food-animal retailer' includes, but is not limited to, any area, place, or premises described in a permit issued by the board wherein veterinary food-animal drugs, as defined in Section 4042, are stored, possessed, or repackaged, and from which veterinary drugs *are furnished, sold, or dispensed at retail pursuant to a prescription from a licensed veterinarian.*" (Italics added.)

[7]Section 4043 defines "wholesaler" as including "every person who acts as a wholesale merchant, broker, jobber, customs broker, reverse distributor, or agent, who sells for resale, or negotiates for distribution, or takes possession of, any drug or device included in Section 4022."

More basically, we find Park Medical's argument unpersuasive because it fails to explain why, if the Legislature had intended to mean by "retailing" that a physician could not dispense drugs on a for-profit basis, the Legislature did not say that. If the Legislature had intended to prohibit dispensing fees, it easily could have so stated, as it did in other statutes. (See §§ 4171, subd. (a) [prohibiting physician from charging a patient a fee for a manufacturer's drug sample]; 4183 [prohibiting a nonprofit or free clinic from charging any professional dispensing fee that may be authorized under the Medi-Cal program]; 4193 [prohibiting a surgical clinic from charging a professional dispensing fee that may be authorized under the Medi-Cal program, offering drugs for sale or charging or billing for professional services for the dispensing or administering of drugs]; 4380 [restricting the resale of drugs acquired at preferentially low prices under the federal Nonprofit Institutions Act (15 U.S.C. § 13c)]; 4425 [restricting the amount a pharmacy participating in the Medi-Cal program may charge for prescription medications].) We believe Park Medical's interpretation of "retailing" is strained and not supported by the language of section 4170 or the Pharmacy Law.

We further note that in the 1980's, there were legislative proposals to prohibit or limit the fees a physician could charge for dispensing drugs to his or her own patients. In February 1986 Assembly Bill No. 3013 (1985-1986 Reg. Sess.) was introduced. This bill would have prohibited physicians from dispensing drugs (other than free manufacturer samples and injectable medications given in the physician's office) unless their practice was in a remote area and a hardship to the patient existed (e.g., an emergency existed). This bill was not enacted.

In March 1987 Assembly Bill No. 1732 (1987-1988 Reg. Sess.) was introduced. As introduced, the bill would have prohibited a physician from dispensing drugs to his or her patients unless the physician's office was more than five miles from a pharmacy, the physician was licensed by the Board of Pharmacy to dispense drugs, the physician dispensed no more than a 72-hour supply of drugs, and the physician did not charge any dispensing fee. These provisions were subsequently deleted and the bill was amended to prohibit a dispensing physician from charging for drugs more than his or her acquisition cost of the drug plus 5 percent for overhead. This provision was also deleted in the final version that was enacted. The final version did not contain any limits on the fees a physician could charge for the drugs he or she dispensed directly to his or her patient. (Stats. 1988, ch. 1600, § 3, pp. 5794-5795.)

This legislative history demonstrates that the Legislature considered prohibiting or restricting the profits a physician could recover from dispensing

drugs to patients, but ultimately did not do so. We note that in some circumstances, a failure to enact an amendment may reflect a legislative determination that the amendment was unnecessary because the statute already provided for the matter covered by the amendment. In this case, one could argue the failure to enact the amendment prohibiting physicians from dispensing drugs on a for-profit basis reflected a legislative determination that such an amendment was unnecessary because section 4170, by its terms, already prohibited such profits. We, however, do not believe that such an inference is reasonable here since, as we explained above, nothing in the statutory language of section 4170 reflects a legislative intent to prohibit profits, and when the Legislature has intended to prohibit dispensing fees or dispensing drugs on a for-profit basis, it has expressly so provided.

At oral argument, Park Medical argued that Assembly Bill No. 1732 (1987-1988 Reg. Sess.) was a complex bill that was subjected to the "political process" but consistently reflected the Legislature's concern about the potential conflict of interest that can arise when physicians dispense drugs to their patients. This is true. The final bill as enacted contains the following statement: "The Legislature finds and declares that the licensed pharmacist plays a critical role as the advocate of the patient-consumer and that when, in whatever manner, the oversight of the pharmacist is not available, the patient-consumer may be deprived of essential consultation. The Legislature further finds and declares that the prescriber's role of patient advocate may be diminished when the prescriber has a financial interest in medications ordered for the patient. Therefore, to protect the patient-consumer and to enforce the legislative intent, the Legislature hereby amends Sections 2191 and 4051 [predecessor to section 4170] of the Business and Professions Code." (Stats. 1988, ch. 1600, § 1, pp. 5793-5794.)

Park Medical argues that prohibiting physicians from dispensing drugs on a for-profit basis would further public policy concerns about a physician's having a conflict of interest when the physician has a financial interest in drugs dispensed to patients. (See also §§ 4111, subd. (a), 650.1 [prohibiting physicians from having ownership or lease interests in a pharmacy].) We find this argument unpersuasive.

Initially we note that we are bound by the words of the statute and the Legislature's intent; we may not rewrite a statute to encompass a public policy urged by a litigant. As we have noted above, the words of the statute and the statutory scheme do not reflect a legislative intent to prohibit physicians from dispensing drugs on a for-profit basis. We may not rewrite the statute to provide otherwise.

Moreover, in 1988, when the Legislature recognized that a potential conflict of interest may arise when a physician has a financial interest in drugs ordered for the patient (quoted above), the Legislature added two new provisions. (Former §§ 4051.1, 4051.2, now encompassed by § 4170, subd. (a)(6) & (7).) These provisions require that dispensing physicians provide a written disclosure informing the patient that he or she has a choice of having the prescription filled by the physician or by a pharmacy of the patient's choice, and require physicians to offer a written prescription that the patient can have filled at any pharmacy. These provisions are clearly addressed to the potential conflict of interest problem and seek to resolve the conflict by ensuring that patients know they have the option of having the prescription filled by a pharmacy and ensuring that physicians, upon request, give a patient a written prescription that can be filled at any pharmacy. The Legislature could have chosen to resolve the potential conflict of interest problem by eliminating any financial interest in the drugs provided to patients by physicians. It did not do so. Instead, the Legislature chose to address the matter by requiring written disclosure to the patient and the option of a written prescription.

As a final point, we note that our construction of section 4170, subdivision (a)(3) as not barring a physician from dispensing drugs on a for-profit basis is consistent with the interpretations of the administrative agencies charged with its enforcement; both the Medical Board of California and the California Board of Pharmacy have reached the same conclusion. Additionally, the Attorney General has issued a memorandum opinion also concluding that the Pharmacy Law does not prohibit physicians from dispensing drugs on a for-profit basis to their patients for the condition for which treatment was sought.

The Medical Board of California specifically rejected the argument that that the Medical Group was keeping a pharmacy in violation of the Pharmacy Law, explaining that the Medical Group is "not advertising to the general public that [it] will fill prescriptions and [is] not holding [itself] out as a pharmacy." The Medical Board of California also concluded that "sections 4171 and 4170 permit a physician to charge for medications that he or she may dispense" except for samples.

The California State Board of Pharmacy similarly has found that charging fees to dispense drugs did not violate the Pharmacy Law.[8]

The Attorney General has written a memorandum opinion, at the request of the California State Board of Pharmacy, concluding that the Pharmacy

---

[8]Park Medical, in support of its motion for summary judgment, submitted a declaration by a pharmacist who was a member of the State Board of Pharmacy from 1991 to 1998 and was

Law does not prohibit physicians from dispensing drugs to their patients on a for-profit basis. The Attorney General specifically rejected arguments similar to those raised here, i.e., that physicians, by dispensing drugs on a for-profit basis, are keeping a pharmacy and are retailing drugs in violation of the Pharmacy Law.

In conclusion, the court correctly ruled that section 4170, subdivision (a)(3) does not bar a physician from dispensing or selling drugs on a for-profit basis to his or her patients for the condition for which the patient has sought treatment.

### DISPOSITION

The judgment is affirmed.

Huffman, J., and McDonald, J., concurred.

---

president of the board from 1993 to 1994. According to this individual, the board discussed physician dispensing and interpreted former section 4051 (the predecessor to § 4170) as prohibiting physicians from dispensing drugs on a for-profit basis because otherwise patient-consumer interests could be compromised by the physician's financial interest in the drugs dispensed. Initially, we note that this declaration does appear to reflect the current position of the California State Board of Pharmacy and further it contains hearsay statements as to the position of the California State Board of Pharmacy. Finally, we note that regardless of the California State Board of Pharmacy's interpretation, our review of the statutory scheme indicates that the Legislature did not intend to prohibit physicians from dispensing drugs on a for-profit basis in section 4170.