# IN THE SUPREME COURT OF CALIFORNIA

JESSICA FERRA et al.,
Plaintiffs and Appellants,

v.

LOEWS HOLLYWOOD HOTEL, LLC,
Defendant and Respondent.

S259172

Second Appellate District, Division Three
B283218

Los Angeles County Superior Court
BC586176

July 15, 2021

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Cuéllar, Kruger, Groban, and Jenkins concurred.

FERRA v. LOEWS HOLLYWOOD HOTEL, LLC

S259172

Opinion of the Court by Liu, J.

Under California law, employers must provide employees with overtime pay when employees work more than a certain amount of time.  (Lab. Code, § 510, subd. (a) (section 510(a)); all undesignated statutory references are to this code.)  To calculate overtime pay, section 510(a) requires an employer to compensate an employee by a multiple of the employee's "regular rate of pay."  California law also provides for meal, rest, and recovery periods.  If an employer does not provide an employee with a compliant meal, rest, or recovery period, section 226.7, subdivision (c) (section 226.7(c)) requires the employer to "pay the employee one additional hour of pay at the employee's regular rate of compensation."

The question here is whether the Legislature intended "regular rate of compensation" under section 226.7(c) to have the same meaning as "regular rate of pay" under section 510(a), such that the calculation of premium pay for a noncompliant meal, rest, or recovery period, like the calculation of overtime pay, must account for not only hourly wages but also other nondiscretionary payments for work performed by the employee.  We hold that the terms are synonymous: "regular rate of compensation" under section 226.7(c), like "regular rate of pay" under section 510(a), encompasses all nondiscretionary payments, not just hourly wages.

1

**I.**

From June 16, 2012, to May 12, 2014, defendant Loews Hollywood Hotel, LLC (Loews), employed plaintiff Jessica Ferra as a bartender. Loews paid Ferra hourly wages as well as quarterly nondiscretionary incentive payments. We use the term "nondiscretionary payments" to mean payments for an employee's work that are owed "pursuant to [a] prior contract, agreement, or promise," not "determined at the sole discretion of the employer." (Division of Labor Standards Enforcement (DLSE), Update of the DLSE Enforcement Policies and Interpretations Manual (rev. 2019) § 49.1.2.4(3), p. 49-3 (2019 DLSE Manual), citing 29 C.F.R. §§ 778.211, 778.213 (2021); see C.F.R. § 778.211 (2021) [a payment is discretionary if "both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer . . . and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly"]; see also *Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, 561 (*Alvarado*) ["[I]t is the court's task to construe how 'regular rate of pay' should be calculated in the circumstances presented here."]; CACI No. 2702 [noting that court, not jury, determines appropriate rate of compensation for overtime].) If an hourly employee was not provided with a compliant meal or rest period, Loews paid the employee an additional hour of pay according to the employee's hourly wage at the time the meal or rest period was not provided. If the employee earned any nondiscretionary payments in addition to an hourly wage, like Ferra's quarterly incentive payments, Loews did not factor these

payments into the calculation of premium pay owed under section 226.7(c).

In 2015, Ferra filed a class action suit against Loews. Among other claims, Ferra alleged that Loews, by omitting nondiscretionary incentive payments from its calculation of premium pay, failed to pay her for noncompliant meal or rest breaks in accordance with her "regular rate of compensation" as required by section 226.7(c). The trial court granted summary adjudication for Loews on the ground that calculating premium pay according to an employee's base hourly rate is proper under section 226.7(c). The court agreed with Loews that "regular rate of compensation" in section 226.7(c) is "not interchangeable" with the term "regular rate of pay" under section 510(a), which governs overtime pay. In light of this holding, the court held that Loews's due process challenge to section 226.7 was moot. The court granted summary judgment to Loews on Ferra's remaining causes of action.

The Court of Appeal affirmed, holding that "regular rate of compensation" in section 226.7(c) and "regular rate of pay" in section 510(a) are "not synonymous, and the premium for missed meal and rest periods is the employee's base hourly wage." (*Ferra v. Loews Hollywood Hotel, LLC* (2019) 40 Cal.App.5th 1239, 1246 (*Ferra*).) Justice Edmon dissented on this point. Tracing the history of sections 510(a) and 226.7(c) and the meaning of "regular rate" in case law and legislative usage, she concluded that " 'regular rate of compensation' has the same meaning as 'regular rate of pay,' and thus . . . includes nondiscretionary bonuses '[that] are a normal and regular part of [an employee's] income.' " (*Ferra*, at p. 1255 (conc. & dis. opn. of Edmon, P. J.).)

We granted review.

## II.

Section 226.7(c) provides: "If an employer fails to provide an employee a meal or rest or recovery period in accordance with a state law, . . . the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the meal or rest or recovery period is not provided." Similar language appears in a wage order promulgated by the Industrial Welfare Commission (IWC). (See *Augustus v. ABM Security Services, Inc.* (2016) 2 Cal.5th 257, 262, fn. 5 [IWC is empowered to promulgate "legislative regulations specifying minimum requirements with respect to wages, hours, and working conditions"].) IWC Wage order No. 5-2001, which applies to hotel workers, bartenders, and similar workers, says that if an employer does not provide a compliant meal or rest period, "the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each work day that" the meal or rest period is not provided. (IWC wage order No. 5-2001, §§ 11(B), 12(B) (Wage Order No. 5-2001); see *id.*, § 2(P)(1)–(2); *Gerard v. Orange Coast Memorial Medical Center* (2018) 6 Cal.5th 443, 448 (*Gerard*) [wage and hour claims, including meal and rest break claims, "are 'governed by two complementary and occasionally overlapping sources of authority,' " i.e., the Labor Code and wage orders].)

" 'When construing the Labor Code and wage orders, we adopt the construction that best gives effect to the purpose of the Legislature and the IWC. . . . Time and again, we have characterized that purpose as the protection of employees — particularly given the extent of legislative concern about

working conditions, wages, and hours when the Legislature enacted key portions of the Labor Code. . . . In furtherance of that purpose, we liberally construe the Labor Code and wage orders to favor the protection of employees.' " (*Troester v. Starbucks Corp.* (2018) 5 Cal.5th 829, 839, citations omitted.) In construing a statute or wage order whose language is susceptible of more than one reasonable interpretation, we consider "the ostensible objectives to be achieved by the statute, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction and the statutory scheme of which the statute is a part." (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1105 (*Murphy*).)

The question is what the Legislature meant when it used the phrase "regular rate of compensation" in section 226.7(c). Neither the Labor Code nor Wage Order No. 5-2001 defines the term, and the words by themselves may reasonably be construed to mean either hourly wages, as Loews contends, or hourly wages plus nondiscretionary payments, as Ferra contends. Central to the parties' dispute is a comparison of the term "regular rate of compensation" in section 226.7(c), which addresses premium pay for meal, rest, or recovery period violations, with the term "regular rate of pay" in section 510(a), which addresses overtime pay. Did the Legislature intend "regular rate of compensation" to be synonymous with "regular rate of pay," a term long understood to encompass not only hourly wages but also nondiscretionary payments?

The Court of Appeal answered no, relying on the principle that " '[w]here different words or phrases are used in the same connection in different parts of a statute, it is presumed the Legislature intended a different meaning.' " (*Ferra, supra*, 40 Cal.App.5th at p. 1247.) But another principle of construction

provides that "where statutes use synonymous words or phrases interchangeably, those words or phrases should be understood to have the same meaning." (*Id.* at p. 1256 (conc. & dis. opn. of Edmon, P. J.); see *id.* at p. 1266 [collecting cases].) Section 226.7(c) and section 510(a) both use the term "regular rate," and the history of these provisions shows that "regular rate" is a term of art encompassing not only hourly wages but also nondiscretionary payments. Further, as explained below, the words "compensation" and "pay" appear interchangeably in legislative and judicial usage, and we find no indication that the Legislature intended "regular rate of pay" in section 510(a) and "regular rate of compensation" in section 226.7(c) to have different meanings. Specifically, we find no evidence that "regular rate of compensation" means hourly wages only.

### A.

"When the Legislature adopted section 226.7 in 2000, it did so against the backdrop of long-standing federal law that defined overtime pay in terms of an employee's *'regular rate,'* and existing state law that defined overtime pay in terms of an employee's *'regular rate of pay.'* " (*Ferra, supra,* 40 Cal.App.5th at p. 1257 (conc. & dis. opn. of Edmon, P. J.).) This historical backdrop is essential to understanding what the Legislature meant by "regular rate of compensation" in section 226.7(c).

Section 7(a) of the federal Fair Labor Standards Act of 1938 (FLSA) required employers to pay overtime "at a rate not less than one and one-half times the regular rate at which he is employed." (Pub.L. No. 75-718 (June 25, 1938) 52 Stat. 1060, 1063; see 29 U.S.C. § 207(a).) Although Congress did not define "regular rate," the United States Supreme Court soon held that an employee's "regular rate" under the statute must reflect "the

actual payments, exclusive of those paid for overtime, which the parties have agreed shall be paid during each workweek." (*Walling v. Harnischfeger Corp.* (1945) 325 U.S. 427, 430 (*Harnischfeger*); see *Walling v. Hardwood Co.* (1945) 325 U.S. 419, 424 (*Hardwood*) ["The regular rate by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments."].)

For workers paid a guaranteed hourly rate plus an " 'incentive bonus' or 'piecework earnings' " (*Harnischfeger*, *supra*, 325 U.S. at p. 429) for efficient performance, the "regular rate" is "greater . . . than the minimum base rate" (*id.* at p. 431). Where "such bonuses are a normal and regular part of [workers'] income" (*id.* at p. 432), they "do not escape the force of [FLSA] § 7(a) merely because they are paid in addition to a minimum hourly pay guaranteed by contract. . . . The conclusion that only the minimum hourly rate constitutes the regular rate opens an easy path for evading the plain design of § 7(a)" (*id.* at pp. 431–432). Further, even if "the incentive bonuses are often not determined or paid until weeks or even months after [regular] pay-days" (*id.* at p. 432), "the employer is not thereby excused from making the proper computation and payment. Section 7(a) requires only that the employees receive a 50% premium as soon as convenient or practicable under the circumstances" (*id.* at pp. 432–433).

Congress amended the FLSA in 1949 to define "regular rate" for purposes of overtime "to include all remuneration for employment paid to, or on behalf of, the employee" (Pub.L. No. 81-393 (Oct. 26, 1949) 63 Stat. 910, 913; see 29 U.S.C. § 207(e)), and courts have consistently understood this language to encompass all nondiscretionary payments, not just base

hourly rates. (See *Local 246 Utility Workers Union of America v. Southern California Edison Co.* (9th Cir. 1996) 83 F.3d 292, 295–297; *Featsent v. City of Youngstown* (6th Cir. 1995) 70 F.3d 900, 904–906; *Reich v. Interstate Brands Corp.* (7th Cir. 1995) 57 F.3d 574, 577; see also Rosen et al., Federal Employment Litigation (The Rutter Group 2021) ¶ 6:905 [observing that "[a]ny bonus promised to employees is included in determining the employee's 'regular rate' of pay" and collecting cases].)

Meanwhile, as early as 1947, California's wage orders imposed similar requirements for overtime pay. (See *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 795 [IWC's wage orders are "at times patterned after federal regulations" and "sometimes provide greater protection"]; *Alcala v. Western Ag Enterprises* (1986) 182 Cal.App.3d 546, 550 (*Alcala*) ["California's wage orders are closely modeled after (although they do not duplicate), section 7(a)(1) of the [FLSA]."].) But instead of using the term "regular rate," the wage orders used the term "regular rate of pay" in stating the requirement that "overtime is compensated for at not less than one and one-half times the employee's regular rate of pay." (IWC wage order No. 10 R (June 1, 1947) [former wage order concerning amusement and recreation industries]; see IWC wage order No. 3 R (June 1, 1947) [former wage order concerning canning and preserving industries]; IWC wage order No. 6 R (June 1, 1947) [former wage order concerning laundry, dry cleaning, and dyeing industries]; IWC wage order No. 8 R (June 1, 1947) [former wage order concerning after-harvest industries].) The term "regular rate of pay" also appears in the 1947 version of Wage Order No. 5 (IWC wage order No. 5 R (June 1, 1947)) and in other predecessors to the current version of Wage Order No. 5 (e.g., IWC wage order No. 5-89 (as amended June 29, 1993)).

Despite this difference in wording, the *Alcala* court understood "regular rate of pay" in a wage order governing agricultural occupations to be synonymous with "regular rate" in the FLSA. (*Alcala*, *supra*, 182 Cal.App.3d at pp. 548–551 & fns. 1–2.) The DLSE, in multiple opinion letters, similarly said that "in determining what payments are to be included in or excluded from the calculation of the regular rate of pay, California will adhere to the standards adopted by the U.S. Department of Labor to the extent that those standards are consistent with California law." (Dept. of Industrial Relations, DLSE, Chief Counsel H. Thomas Cadell, Jr., Opn. Letter No. 2003.01.29, Calculation of Regular Rate of Pay (Jan. 29, 2003) p. 2, fn. 1; see, e.g., Dept. of Industrial Relations, DLSE, Chief Counsel H. Thomas Cadell, Jr., Opn. Letter No. 1994.06.17-1, Regular Rate of Pay (June 17, 1994) p. 2; Dept. of Industrial Relations, DLSE, Chief Counsel H. Thomas Cadell, Jr., Opn. Letter No. 1991.03.06, Calculation of Regular Rate of Pay (Mar. 26, 1991) p. 1.) And the DLSE's 1998 Enforcement Policies and Interpretations Manual (1998 DLSE Manual) stated: "Since the Industrial Welfare Commission has not defined the term 'regular rate of pay,' DLSE has determined that the IWC intended to adopt the definition of 'regular rate of pay' set out in the Fair Labor Standards Act . . . ." (1998 DLSE Manual, p. 84; see *Alvarado*, *supra*, 4 Cal.5th at p. 561 [in construing California's labor laws, "we may take into consideration the DLSE's expertise and special competence, as well as the fact that the DLSE Manual is a formal compilation that evidences considerable deliberation at the highest policymaking level of the agency"].)

The term "regular rate of pay" first appeared in section 510 in 1999. That year, "the Legislature enacted Assembly Bill

No. 60 (1999–2000 Reg. Sess.) (Assembly Bill 60), known as the Eight-Hour-Day Restoration and Workplace Flexibility Act of 1999 (Stats. 1999, ch. 134, § 1, p. 1820). This bill was passed in response to IWC wage orders that had eliminated overtime for employees working more than eight hours per day. The legislation repealed five wage orders, . . . and required the IWC to review its wage orders and readopt orders restoring daily overtime. [Citation.] The Legislature amended Labor Code section 510 to explicitly provide that '[a]ny work in excess of eight hours in one workday . . . shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee.' (Stats. 1999, ch. 134, § 4, p. 1821; cf. Stats. 1982, ch. 185, § 1, p. 563 [earlier version of § 510 without that provision].)" (*Gerard, supra,* 6 Cal.5th at pp. 448–449; see *Alvarado, supra,* 4 Cal.5th at p. 553.)

Like the DLSE, courts have understood "regular rate of pay" in section 510(a) to have the same meaning as "regular rate" in the FLSA. Citing the DLSE's opinion letters, the court in *Huntington Memorial Hospital v. Superior Court* (2005) 131 Cal.App.4th 893, 902–911 (*Huntington*) interpreted section 510(a) in accordance with the meaning of "regular rate" in the FLSA, as elucidated in federal regulations and case law. (See, e.g., *Hardwood, supra,* 325 U.S. at p. 424.) Notably, the *Huntington* court treated "regular rate" as the operative term in section 510(a)'s phrase "regular rate of pay." (*Huntington*, at p. 902 ["Under state and federal law, overtime compensation is based on an employee's 'regular rate.' (See Lab. Code, § 510, subd. (a); 29 U.S.C. § 207(a)(1), (2).)"]; see *Kao v. Holiday* (2017) 12 Cal.App.5th 947, 960, fn. 5 [following *Huntington*]; *Advanced-Tech Security Services v. Superior Court* (2008) 163 Cal.App.4th 700, 708 (*Advanced-Tech*) [same].)

In addition, we recently said that "an employee's 'regular rate of pay' for purposes of Labor Code section 510 and the IWC wage orders is not the same as the employee's straight time rate (i.e., his or her normal hourly wage rate). Regular rate of pay, which can change from pay period to pay period, includes adjustments to the straight time rate, reflecting, among other things, shift differentials and the per-hour value of any nonhourly compensation the employee has earned." (*Alvarado*, *supra*, 4 Cal.5th at p. 554; see *id.* at p. 569 ["Not all employees earn at a fixed pay rate throughout a pay period, and therefore regular rate of pay is a *weighted average* reflecting work done at varying times, under varying circumstances, and at varying rates."].) Consistent with the meaning of "regular rate" in the FLSA, we observed that an "attendance bonus" earned for weekend work (a form of "incentive pay") was "part of an employee's overall compensation package, and therefore . . . its per-hour value must be determined so that the employee's regular rate of pay — and, derivatively, the employee's overtime pay rate — reflects all the various forms of regular compensation that the employee earned in the relevant pay period." (*Alvarado*, at p. 554.)

In sum, the history above shows that the term "regular rate" in section 7(a) of the FLSA accounts for not only hourly wages but also nondiscretionary payments and that the term "regular rate of pay" as used in section 510(a) and in the IWC's earlier wage orders has the same meaning as "regular rate" in the FLSA. With this backdrop in mind, we now turn to the phrase "regular rate of compensation" in the context of premium pay for a noncompliant meal, rest, or recovery period.

**B.**

As noted, when the Legislature passed Assembly Bill No. 60 (1999–2000 Reg. Sess.) (Assembly Bill 60) in 1999, it not only enacted section 510 but also directed the IWC to rewrite its wage orders to restore daily overtime pay. "Consistent with that mandate, the IWC adopted a new version of Wage Order No.5 on June 30, 2000, and it became effective on October 1, 2000." (*Gerard, supra,* 6 Cal.5th at p. 449; see *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1046 (*Brinker*).) This wage order, which is the current version, provides that an employee who works more than eight hours a day or more than 40 hours a week must receive one and one-half times the employee's "regular rate of pay" for overtime hours worked. (Wage Order No. 5-2001, § 3(A)(1); see *id.*, § 3(A)(1)(b) [requiring double the "regular rate of pay" for all hours worked beyond 12 hours in a day or beyond eight hours on the seventh consecutive workday in a workweek].) These overtime provisions in the wage order echo the language of section 510(a). (See *Brinker*, at p. 1049 ["Having received a legislative rebuke, the IWC sought to make its orders track [Assembly Bill 60] as closely as possible and expressed hesitance about departing from statutory requirements."].)

In the same wage order, the IWC for the first time adopted provisions requiring premium pay for meal or rest break violations: "the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation" for each workday that a compliant meal or rest period is not provided. (Wage Order No. 5-2001, §§ 11(B), 12(B).) This is where the phrase "regular rate of compensation" first appeared.

An IWC commissioner explained the purpose of these provisions at the June 30, 2000 hearing where the IWC adopted them. (See *Murphy, supra,* 40 Cal.4th at pp. 1109–1110 [relying on this hearing to discern IWC's intent in requiring premium pay for meal and rest break violations].) The IWC, the commissioner said, had "received testimony that despite the fact that employees are entitled to a meal period or rest period, that there really is no incentive as we establish it, for example, in overtime or other areas, for employers to ensure that people are given their rights to a meal period and rest period. At this point, if they are not giving a meal period or rest period, the only remedy is an injunction against the employer or — saying they must give them." (IWC public hearing transcript (June 30, 2000) p. 25.) The new provisions, the commissioner explained, would ensure that employees received "proper meal periods and rest periods." (*Id.* at p. 26.) "And, of course," the commissioner concluded, "the courts have long construed overtime as a penalty, in effect, on employers for working people more than full — you know, that is how it's been construed, as more than the — the daily normal workday. It is viewed as a penalty and a disincentive in order to encourage employers not to. So, it is in the same authority that we provide overtime pay that we provide this extra hour of pay." (*Id.* at p. 30.)

Soon thereafter, the IWC memorialized this understanding in its Statement as to the Basis, a document "explaining 'how and why the commission did what it did.'" (*Harris v. Superior Court* (2011) 53 Cal.4th 170, 179; see *Brinker, supra,* 53 Cal.4th at p. 1046.) In reviewing its wage orders "for purposes of complying with AB 60," "the IWC heard testimony and received correspondence regarding the lack of employer compliance with the meal and rest period

requirements of its wage orders. The IWC therefore added a provision to this section that requires an employer to pay an employee one additional hour of pay at the employee's *regular rate of pay* for each work day that a meal period is not provided." (IWC, Statement as to the Basis (Jan. 1, 2001) pp. 1, 20, italics added.) The IWC also "added a provision . . . that requires an employer to pay an employee one additional hour of pay at the employee's *regular rate of pay* for each work day that a rest period is not provided." (*Id.* at p. 21, italics added.) As the italicized phrases indicate, the IWC used the term "regular rate of pay" interchangeably with the wage order's term "regular rate of compensation." And, as the June 30, 2000 hearing transcript suggests, the IWC understood its approach to premium pay for meal or rest break violations to be analogous to its approach to overtime pay.

We come now to the enactment of section 226.7. The same Legislature that passed Assembly Bill 60 considered several bills containing some version of what became section 226.7; the bill that ultimately passed was Assembly Bill No. 2509 (1999–2000 Reg. Sess.) (Assembly Bill 2509). (See *Kirby v. Immoos Fire Protection, Inc.* (2012) 53 Cal.4th 1244, 1258.) At its inception, Assembly Bill 2509 provided that an employer was required to pay "the aggrieved employee of an amount equal to *twice his or her average hourly rate of compensation* for the full length of the meal or rest periods during which the employee was required to perform any work. An employee paid on a piecework basis shall be entitled to an amount equal to twice the amount of piecework units earned during those periods, but in no event shall the amount be less than the applicable state minimum wage for the full length of those time periods during which any work was performed." (Assem. Bill 2509 (1999–2000

Reg. Sess.) as introduced Feb. 24, 2000, § 12, italics added.) This language remained unchanged through two rounds of amendments. (Assem. Bill 2509 (1999–2000 Reg. Sess.) as amended June 26, 2000; Assem. Bill 2509 (1999–2000 Reg. Sess.) as amended July 6, 2000.)

With Assembly Bill 2509 pending, the IWC on June 30, 2000, adopted the meal and rest break provisions in Wage Order No. 5-2001. (*Ante*, at p. 12.) Two months later, Assembly Bill 2509 was amended to provide that "the employer shall pay the employee *one additional hour of pay at the employee's regular rate of compensation* for each work day that the meal or rest period is not provided." (Assem. Bill 2509 (1999–2000 Reg. Sess.) as amended Aug. 25, 2000, § 7, italics added.) This language is what the Legislature enacted in section 226.7(c). The reason for the amendment is clear in the legislative history: "In discussing the amended version of section 226.7, which ultimately was signed into law, the Senate Rules Committee explained that the changes were intended to track the existing provisions of the IWC wage orders regarding meal and rest periods." (*Murphy*, *supra*, 40 Cal.4th at pp. 1107–1108, citing Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill 2509 (1999–2000 Reg. Sess.) as amended Aug. 25, 2000, p. 4.) The amendment "[d]elete[d] the provisions related to penalties for an employer who fails to provide a meal or rest period" (i.e., twice the employee's average hourly rate of compensation) "and instead codif[ies] the alternative penalty amounts adopted by the Industrial Welfare Commission" (i.e., one additional hour of pay at the employee's regular rate of compensation). (Assem. Conc. Sen. Amends. to Assem. Bill 2509 (1999–2000 Reg. Sess.) as amended Aug. 25, 2000, p. 2.)

To recap, the IWC adopted a premium pay requirement for meal or rest break violations using the term "regular rate of compensation" at the same time and in the same wage order (i.e., Wage Order No. 5-2001) that it adopted revised overtime provisions using the term "regular rate of pay."  The IWC's official explanation of its action described this premium pay as "one additional hour of pay at the employee's regular rate of pay."  Then, in enacting section 226.7(c), the Legislature defined premium pay for break violations as "one additional hour of pay at the employee's regular rate of compensation" to track the meal and rest break provisions of Wage Order No. 5-2001.

## C.

In addressing this history, Loews contends that at the time the IWC and the Legislature adopted the premium pay requirement for meal or rest break violations, the term "regular rate of pay" was an established term of art in the specific context of California overtime law.  It is thus significant, Loews says, that the IWC and the Legislature, while using "regular rate of pay" in addressing overtime in Wage Order No. 5-2001 and section 510(a), used a different term — "regular rate of compensation" — to define premium pay for meal or rest break violations in the same wage order and in section 226.7(c).  In Loews's view, the Court of Appeal was correct to apply the canon that " '[w]here different words or phrases are used in the same connection in different parts of a statute, it is presumed the Legislature intended a different meaning.' "  (*Ferra, supra,* 40 Cal.App.5th at p. 1247.)

But canons of interpretation "are not immutable rules"; they are "guidelines subject to exceptions."  (*Wishnev v. The Northwestern Mutual Life Ins. Co.* (2019) 8 Cal.5th 199, 213

[canons cannot be mechanically applied, especially when competing canons point in different directions].) Here, Loews's argument is difficult to square with the fact that courts and the DLSE have consistently understood the term "regular rate of pay" to have the same meaning as "regular rate" in the FSLA. Although Loews says this "mere fact . . . does not establish that 'regular rate' is itself a term of art under California law," Loews cites no authority that has trained attention on the modifier "of pay." The fact that California authorities, in construing "regular rate of pay," have looked to the meaning of "regular rate" in the FLSA implies that "regular rate" is the operative term of art. (See *Advanced-Tech*, *supra*, 163 Cal.App.4th at pp. 707–708; *Huntington*, *supra*, 131 Cal.App.4th at pp. 902–905; *Alcala*, *supra*, 182 Cal.App.3d at pp. 549–550; Dept. of Industrial Relations, DLSE, Chief Counsel H. Thomas Cadell, Jr., Opn. Letter No. 2003.01.29, Calculation of Regular Rate of Pay, *supra*, at p. 2, fn. 1 ["[T]he failure of the IWC to define the term 'regular rate' indicates the Commission's intent that in determining what payments are to be included in or excluded from the calculation of the regular rate of pay, California will adhere to the standards adopted by the U.S. Department of Labor to the extent that those standards are consistent with California law."]; *ante*, at p. 9 [citing 1994 and 1991 DLSE opinion letters and 1998 DLSE Manual].)

Indeed, by the time section 226.7 was enacted, the phrase "regular rate" had been in use and had been treated by courts and agencies as the operative term for more than half a century. (*Ante*, at pp. 6–11.) There is no sign that the IWC or the Legislature believed otherwise when they enacted Wage Order No. 5-2001 and sections 510(a) and 226.7(c). The use of "regular rate" in those contemporaneous enactments to define both

17

overtime pay and premium pay for break violations calls to mind a different canon: "Similar terms should be given consistent meaning when used in the same statutory scheme unless there is evidenced a contrary statutory intent." (*People v. Cook* (1984) 158 Cal.App.3d 948, 954.)

Loews sees evidence of a contrary intent in the Legislature's and IWC's use of "regular rate" with different modifiers, i.e., "of pay" and "of compensation." But neither the adoption history of the phrase "regular rate of compensation" nor the provisions in which it appears contain any hint that the Legislature or the IWC intended it to mean something different than "regular rate of pay" or specifically to mean an employee's hourly rate only. In fact, the Legislature used the terms "pay" and "compensation" interchangeably in the very text of sections 226.7(c) and 510(a). (See § 226.7(c) ["the employer shall *pay* the employee one additional hour of *pay* at the employee's regular rate of *compensation*" (italics added)]; § 510(a) [overtime "shall be *compensated* at the rate of [a multiple of] the regular rate of *pay*" (italics added)]; *ibid.* ["Nothing in this section requires an employer to combine more than one *rate of overtime compensation* in order to calculate *the amount to be paid* to an employee for any hour of overtime work." (italics added)].) The IWC similarly described its requirement of "one (1) hour of pay at the employee's *regular rate of compensation*" for each workday that a compliant meal or rest period is not provided (Wage Order No. 5-2001, §§ 11(B), 12(B), italics added) as "one additional hour of pay at the employee's *regular rate of pay*" (IWC, Statement as to the Basis*, supra*, at pp. 20, 21, italics added).

The fact that the Legislature and IWC used "pay" and "compensation" interchangeably is unsurprising against the

backdrop of similar interchangeable usage in case law. (See *Bay Ridge Operating Co. v. Aaron* (1948) 334 U.S. 446, 448–449 [using "regular rate of pay" to mean "regular rate" under the FLSA]; *Hardwood, supra*, 325 U.S. at p. 424 [using "regular rate of compensation" to mean "regular rate"]; *Harnischfeger, supra*, 325 U.S. at p. 430 [same]; *Walling v. Garlock Packing Co.* (2d Cir. 1947) 159 F.2d 44, 46 [same]; *Walling v. Wall Wire Products Co.* (6th Cir. 1947) 161 F.2d 470, 473, 475 [using both "regular rate of pay" and " 'regular rate' of compensation" to mean "regular rate"].) It is doubtful that the phrase "regular rate of compensation" came to have a distinct meaning that the Legislature and IWC silently discerned in the year 2000, but that the courts until then never had.

Loews cites several federal district court opinions holding that "regular rate of compensation" in section 226.7(c) does not have the same meaning as "regular rate of pay" in section 510(a) and instead means an employee's base hourly rate only. But those opinions did not examine the history of the provisions at issue; they mainly relied on the canon that " '[i]f the legislature carefully employs a term in one statute and deletes it from another, it must be presumed to have acted deliberately.' " (*Brum v. MarketSource, Inc.* (E.D.Cal., June 19, 2017, No. 2:17–cv–241–JAM–EFB) 2017 WL 2633414, p. *5; see *Wert v. U.S. Bancorp* (S.D.Cal., June 9, 2015, No. 13–cv–3130–BAS (BLM)) 2015 WL 3617165, p. *3 ["[T]he legislature's choice of different language is meaningful . . . ."]; *Bradescu v. Hillstone Restaurant Group, Inc.* (C.D.Cal., Sept. 18, 2014, No. SACV 13–1289–GW (RZx)) 2014 WL 5312546, p. *8 [same]; but see *Studley v. Alliance Healthcare Services, Inc.* (C.D.Cal., July 26, 2012, No. SACV 10–00067–CJC (ANx)) 2012 WL 12286522, p. *4,

fn. 4 ["[T]he operative word or phrase in each section is not 'compensation' or 'pay' but rather 'regular rate.' "].)

Justice Edmon, upon examining the history, aptly described the difficulty with Loews's position: "In 1999, 'regular rate' [in the FLSA] was widely understood to mean base hourly rate *plus bonuses*. Although the Legislature modified the federal language when it adopted section 510, the Legislature intended 'regular rate of pay' to have the same meaning as 'regular rate.' But although the Legislature modified the federal language in a similar (although not identical) manner when it adopted section 226.7, [Loews contends] it intended an entirely different meaning — and although it nowhere articulated that intended meaning, it expected parties and the courts to infer the meaning by its use of the word 'compensation,' rather than 'pay.' I am not persuaded." (*Ferra, supra,* 40 Cal.App.5th at p. 1265 (conc. & dis. opn. of Edmon, P. J.).) Neither are we.

## D.

Loews suggests that interpreting "regular rate of compensation" and "regular rate of pay" to be synonymous would render the words "of compensation" and "of pay" superfluous. It is true that courts should generally avoid interpreting statutes in a way that renders some terms surplusage. (*Kaanaana v. Barrett Business Services, Inc.* (2021) 11 Cal.5th 158, 176.) But " ' " 'the rule against surplusage will be applied only if it results in a *reasonable* reading of the legislation.' " ' " (*Ferra, supra,* 40 Cal.App.5th at p. 1265 (conc. & dis. opn. of Edmon, P. J.), quoting *Park Medical Pharmacy v. San Diego Orthopedic Associates Medical Group, Inc.* (2002) 99 Cal.App.4th 247, 254, fn. 5.) To attribute "controlling significance to the modifier 'of compensation' " would lead "to an

entirely *unreasonable* conclusion — namely, that the Legislature used the phrase 'regular rate' in section 226.7 without intending the meaning 'regular rate' had acquired over the course of more than 60 years." (*Ferra*, at p. 1265 (conc. & dis. opn. of Edmon, P. J.).) Had the Legislature intended to diverge from decades of settled usage and, in effect, compel employers to make complex judgments about what is and what is not part of an employee's "regular rate of compensation," it likely would have said so. (See *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1171.)

Loews further contends that "[t]he rationale for defining 'regular rate of pay' to include forms of pay other than the base hourly rate — to ensure employers do not circumvent overtime laws by paying a low hourly rate — is logically inapplicable to break premiums, which unlike overtime premiums are not proportional to time worked and may be owed to employees who perform no overtime work." According to Loews, " 'pay' invariably is given for goods or services rendered, while 'compensation' additionally may pertain to *remuneration for a loss* — such as deprivation of a legally-required meal break or rest period. This distinction aptly reflects this Court's recognition that break premiums are designed to preserve employees' health and welfare, as opposed to overtime premiums which are calculated to provide full wages for work performed."

But even if we were to agree with Loews that "compensation" and "pay" mean different things, there is little reason to think the former would mean something narrower than the latter. (Compare Black's Law Dict. (11th ed. 2019) [Defining "compensation" as " '[Compensation] includes wages, stock option plans, profit-sharing, commissions, bonuses, golden

parachutes, vacation, sick pay, medical benefits, disability, leaves of absence, and expense reimbursement' "] with *id.* [defining "Pay" as "Compensation for services performed; salary, wages, stipend, or other renumeration given for work done"].)

Further, we have previously rejected the argument that because premium pay under section 226.7(c) is "not proportional to time worked," it is "unlike overtime premiums." In *Murphy*, we acknowledged that "a one-to-one ratio does not exist between the economic injury caused by meal and rest period violations on the one hand and the remedy selected by the Legislature on the other hand." (*Murphy*, *supra*, 40 Cal.4th at p. 1112.) Nevertheless, we said, premium pay under section 226.7(c) does not differ in this respect from other remedies the Legislature has chosen "to compensate employees for certain kinds of labor or scheduling resulting in a detriment to the employee." (*Murphy*, at p. 1112.) We gave three examples of such remedies, including overtime premiums under section 510(a). (*Murphy,* at pp. 1112–1113.) "Each of these forms of compensation, like the section 226.7 payment, uses the employee's rate of compensation" — note again the interchangeable usage — "as the measure of pay and compensates the employee for events other than time spent working. An employee working nine hours already receives his or her normal wage for that ninth hour. The Legislature has directed, however, that employers pay a premium wage of 50 percent more for the ninth through twelfth hour and a 100 percent premium for the hours in excess of 12." (*Id.* at p. 1113.)

As *Murphy* makes clear, contrary to Loews's argument, the 50 percent (or 100 percent) overtime premium (§ 510(a)), like the "additional hour of pay" premium for meal or rest break violations (§ 226.7(c)), "compensates the employee for events

22

*other than time spent working.*" (*Murphy, supra,* 40 Cal.4th at p. 1113, italics added.) Employees may suffer "noneconomic injuries" when they are forced to work through break periods, like "greater risk[s] of work-related accidents and increased stress," or denials of "time free from employer control that is often needed to be able to accomplish important personal tasks." (*Ibid.*; see *Alvarado, supra,* 4 Cal.5th at p. 561, fn. 7 [quoting Legislature's statements in Assem. Bill 60 (Stats. 1999, ch. 134, § 2, p. 1820) that " '[t]he eight-hour workday is the mainstay of protection for California's working people'; '[n]umerous studies have linked long work hours to increased rates of accident and injury'; [and] '[f]amily life suffers when either or both parents are kept away from home for an extended period of time on a daily basis' "].) We see nothing illogical about using the same metric ("regular rate") to calculate the amount of the premium owed in both contexts. "While it may be difficult to assign a value to these noneconomic injuries [citation], the Legislature has selected an amount of compensation it deems appropriate." (*Murphy,* at p. 1113.)

Instead of furthering section 226.7(c)'s purpose, construing "regular rate of compensation" in the manner Loews urges would produce consequences that the Legislature likely did not intend. To adapt an example from Ferra's briefing, suppose Employees A, B, and C each work for a chair manufacturer with a different compensation scheme. Employee A is paid a straight hourly rate of $25 per hour. Employee B is paid $50 per chair, plus the hourly rate for meal and rest periods required by law (and assume there is no other nonproductive time during the workday). (See § 226.2 [governing piece-rate compensation].) And Employee C is paid $20 per hour, plus $10 per chair. Suppose further that, in a five-day workweek, each

employee makes 20 chairs by working eight hours a day (i.e., no overtime).

In one week, Employee A earns $1,000 ($25 per hour multiplied by 40 hours), as do Employee B ($50 per chair multiplied by 20 chairs) and Employee C ($20 per hour multiplied by 40 hours, plus $10 per chair multiplied by 20 chairs). The hourly pay for each employee is $25 per hour ($1,000 divided by 40 hours). There is no dispute that $25 per hour is the "regular rate of compensation" for purposes of calculating meal or rest break premium pay for Employees A and B. (See 2002 DLSE Manual, *supra*, at p. 49-6.) But under Loews's position, the "regular rate of compensation" for Employee C is only the base hourly rate of $20 per hour.

We see no reason why the Legislature or IWC would have singled out workers like Employee C, who receive both hourly wages and other nondiscretionary payments, for such disadvantage instead of requiring premium pay in accordance with the total nondiscretionary payments earned by each employee. Were we to adopt Loews's interpretation, employers would be incentivized to minimize employees' base hourly rates and shift pay elsewhere, thereby harming employees who are paid in some form other than a base hourly rate. Loews's interpretation thus undercuts one of section 226.7's functions: "shaping employer conduct" to comply with labor standards. (*Murphy*, *supra*, 40 Cal.4th at p. 1109; see *id.* at p. 1110 ["The IWC intended that, like overtime pay provisions, payment for missed meal and rest periods be enacted as a premium wage to compensate employees, while also acting as an incentive for employers to comply with labor standards."].)

Assembly Bill 2509's legislative history also weighs against Loews's reading. As noted, Assembly Bill 2509 originally included differentiated remedies for piece-rate workers and hourly workers. (*Ante*, at p. 14.) But these were replaced with one remedy for all workers: an hour of pay at the "regular rate of compensation," whatever the underlying basis of their compensation. (*Ante*, at pp. 14–15.) This early iteration of Assembly Bill 2509 shows that the Legislature was equally concerned with protecting piece-rate workers and hourly workers, and it supports an inference that the Legislature believed the language it ultimately adopted — "regular rate of compensation" — would protect workers equally, regardless of how their compensation is structured.

In sum, we hold that the term "regular rate of compensation" in section 226.7(c) has the same meaning as "regular rate of pay" in section 510(a) and encompasses not only hourly wages but all nondiscretionary payments for work performed by the employee. This interpretation of section 226.7(c) comports with the remedial purpose of the Labor Code and wage orders and with our general guidance that the "state's labor laws are to be liberally construed in favor of worker protection." (*Alvarado*, *supra*, 4 Cal.5th at p. 562.)

## III.

Finally, Loews argues that our decision today should apply only prospectively. But no considerations of fairness or public policy warrant such a holding.

In general, judicial decisions apply retroactively. (*Vazquez v. Jan-Pro Franchising International, Inc.* (2021) 10 Cal.5th 944, 951 (*Vazquez*); see *Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978.) This rule applies to decisions

interpreting statutes, for " '[a] judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction.' " (*Vazquez*, at p. 951.) And the fact that a decision disapproves decisions by lower courts does not itself justify applying our decision prospectively only. (*Id.* at p. 952.) We recognize " 'narrow exceptions to the general rule of retroactivity . . . when considerations of fairness and public policy are so compelling in a particular case that, on balance, they outweigh the considerations that underlie the basic rule.' " (*Ibid.*)

In this case, we interpret a statute against the backdrop of a divided Court of Appeal decision and conflicting opinions of various federal district courts. We neither overrule nor disapprove any decision. Because the question presented is not one on " 'which this court had previously issued a definitive decision, from the outset any reliance on the previous state of the law could not and should not have been viewed as firmly fixed as would have been the case had we previously spoken.' " (*Vazquez, supra*, 10 Cal.5th at p. 953.) "In short, defendant cannot claim reasonable reliance on settled law." (*Alvarado, supra*, 4 Cal.5th at p. 573.)

Loews argues, first, that it and employers like it reasonably relied on the canon that a lawmaker is presumed to intend a different meaning when it uses different words in a statutory scheme. But it is well established that "canons of statutory construction are merely aids to ascertaining probable legislative intent." (*Stone v. Superior Court* (1982) 31 Cal.3d 503, 521, fn. 10.) " ' "No single canon of statutory construction is an infallible guide to correct interpretation in all circumstances" ' " (*Tellez v. Superior Court* (2020) 56

Cal.App.5th 439, 448), and "canons of construction . . . will not be applied so as to defeat the underlying legislative intent otherwise determined" (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1391). As explained above, the considerations bearing on the IWC's and Legislature's intent do not support the application of the canon cited by Loews.

Second, relying on *Claxton v. Waters* (2004) 34 Cal.4th 367 (*Claxton*), Loews argues that our decision will have a substantive effect because it will expose employers to "millions" in liability. But Loews cites no evidence that retroactive application of our holding will expose employers to "millions" in liability, and even if Loews were correct, it is not clear why we should favor the interest of employers in avoiding "millions" in liability over the interest of employees in obtaining the "millions" owed to them under the law.

Further, *Claxton* does not suggest that retroactivity is disfavored when a judicial decision may have the substantive effect of imposing liability. In *Claxton*, we explained that one consideration relevant to the retroactivity determination was " ' "the nature of the change as substantive or procedural." ' " (*Claxton, supra*, 34 Cal.4th at p. 378, quoting *Smith v. Rae-Venter Law Group* (2002) 29 Cal.4th 345, 372.) In *Smith*, we relied on *Woods v. Young* (1991) 53 Cal.3d 315, where we declined to apply retroactively our decision involving a statute of limitations for medical malpractice actions. (*Woods*, at p. 330.) The decision in *Woods* was "procedural, affecting only the calculation of the limitations period." (*Ibid.*) "Prospective application will not remove any substantive defense to which defendants would otherwise be entitled," we explained, but retroactive application "would bar plaintiffs' actions regardless of their merits." (*Ibid.* ["Retroactive application of an

unforeseeable procedural change is disfavored when such application would deprive a litigant of 'any remedy whatsoever.' "].) Here, our decision will not deprive any litigant of a remedy or defense. An employee may claim that his or her employer has violated section 226.7, and the employer may defend against such a claim as it has always done. We have simply determined how the Legislature intended premium pay to be calculated under section 226.7(c), nothing more.

Third, Loews asserts that applying our decision prospectively only would not negatively impact the administration of justice or frustrate the purpose our decision. But "if we were to restrict our holding to prospective application, we would, in effect, negate" the full extent of the remedy "that the Legislature has determined to be appropriate in this context," thereby "exceed[ing] our appropriate judicial role." (*Alvarado*, *supra*, 4 Cal.5th at p. 573.) Loews also argues that our interpretation of section 226.7(c) violates due process because ordinary people could not have foreseen our interpretation, but we have rejected similar arguments before. (See *Alvarado*, at p. 572 ["This argument, too, is meritless."].) Because our reading of "regular rate of compensation" in section 226.7(c) is "[o]ne very reasonable way to construe" the phrase, Loews "is simply wrong when it argues that ordinary people could not have predicted plaintiff's interpretation, and that it would violate defendant's due process rights to adopt that interpretation." (*Alvarado*, at p. 572.)

For these reasons, we reject Loews's request that we apply our decision only prospectively.

## CONCLUSION

We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

**LIU, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Ferra v. Loews Hollywood Hotel, LLC

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 40 Cal.App.5th 1239
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S259172
**Date Filed:** July 15, 2021

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Kenneth R. Freeman

_____

**Counsel:**

Moss Bollinger, Dennis F. Moss, Ari E. Moss; Law Offices of Sahag Majarian II and Sahag Majarian II for Plaintiffs and Appellants.

Altshuler Berzon, Michael Rubin, Eileen B. Goldsmith; Haffner Law, Joshua H. Haffner, Graham G. Lambert; Stevens and Paul D. Stevens for California Employment Lawyers Association and Jacqueline F. Ibarra as Amici Curiae on behalf of Plaintiffs and Appellants.

Capstone Law, Melissa Grant, Ryan H. Wu and John E. Stobart for Bet Tzedek as Amicus Curiae on behalf of Plaintiffs and Appellants.

Ballard Rosenberg Golper & Savitt, Richard S. Rosenberg, John J. Manier and David Fishman for Defendant and Respondent.

Seyfarth Shaw, Jeffrey A. Berman, Brian T. Ashe and Kiran A. Seldon for California Employment Law Counsel, Employers Group and

Chamber of Commerce of the United States as Amici Curiae on behalf of Defendant and Respondent.

Blank Rome, Brock Seraphin; Lathrop GPM and Laura Reathaford for Association of Southern California Defense Counsel as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Dennis F. Moss
Moss Bollinger LLP
15300 Ventura Boulevard, Suite 207
Sherman Oaks, CA 91403
(310) 773-0323

Eileen B. Goldsmith
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151

David J. Fishman
Ballard Rosenberg Golper & Savitt, LLP
15760 Ventura Boulevard, 18th Floor
Encino, CA 91436
(818) 508-3707