Filed 8/28/23 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

<table>
<tr>
<td>
JAMES V. LACY et al.,<br><br>
      Plaintiffs and Respondents,<br><br>
v.<br><br>
CITY AND COUNTY OF SAN FRANCISCO et al.,<br><br>
      Defendants and Appellants.
</td>
<td>
A165899<br><br>
(City & County of San Francisco<br>
Super. Ct. No. CPF-22-517714)<br><br>
<strong>ORDER MODIFYING OPINION;<br>
AND ORDER DENYING<br>
PETITION FOR REHEARING<br>
[NO CHANGE IN JUDGMENT]</strong>
</td>
</tr>
</table>

The opinion filed August 8, 2023 is modified as follows:

(1)　　In the second paragraph, that starts with " 'Generally courts will only consider issues properly raised by the parties on appeal.  [Citations.] However, the Supreme Court has recognized two exceptions to this rule,' " on page 29, change the (*Sacramento County Employees' Retirement System v. Superior Court* (2011) 195 Cal.App.4th 440, 473.) to be (*Sacramento County Employees' Retirement System v. Superior Court* (2011) 195 Cal.App.4th 440, 473 (*Sacramento County*).).

(2) Insert the following footnote at the end of the same paragraph, after ". . . we will consider the new argument." on page 29:

> In a petition for rehearing, Plaintiffs argue Government Code section 68081 requires this court to order supplemental briefing on the vote dilution issue before deciding it.  The parties had an opportunity to address the issue in briefs responding to the amicus briefs.  In that

brief, Plaintiffs provided a short substantive argument on the vote dilution issue and suggested this court "consider" supplemental briefing or a remand to the trial court. That Plaintiffs did not elect to discuss the issue in greater depth does not mean they are entitled to additional briefing. "[Government Code] [s]ection 68081 does not require that a party actually have briefed an issue; it requires only that the party had the opportunity to do so." (*People v. Alice* (2007) 41 Cal.4th 668, 677.) Plaintiffs' rehearing petition also contends *Sacramento County, supra,* 195 Cal.App.4th 440 does not support this court's consideration of the vote dilution argument, and that this court should not consider the argument because the parties did not have the opportunity to develop a factual record below. In their response to the amicus briefs, however, Plaintiffs argued this court should consider the issue, and cited *Sacramento County*. Moreover, in their rehearing petition, Plaintiffs fail to explain why further factual development is necessary, much less provide examples of evidence—or even general types of evidence—they would seek to present relevant to the vote dilution issue.

This footnote will become footnote number 29, renumbering all subsequent footnotes accordingly.

This order does not effect a change in the judgment.

Plaintiffs' August 23, 2023 petition for rehearing is denied.


SIMONS, Acting P.J.


WE CONCUR:

BURNS, J.
CHOU, J.


*Lacy v. City & County of San Francisco* (A165899)

2

Trial Court:       City and County of San Francisco Superior Court

Trial Judge:      Hon. Richard B. Ulmer, Jr.

Counsel:          David Chiu, City Attorney, Wayne Snodgrass, and James M. Emery, Deputy City Attorneys for Defendants and Appellants

                    Keker, Van Nest & Peters, R. Adam Lauridsen, Connie P. Sung, and Stephany Martinez Tiffer for Ron Hayduk, Hiroshi Motomura, and Jennifer M. Chacón as Amicus Curiae on behalf of Defendants and Appellants

                    Orrick Herrington & Sutcliffe, Mark S. Davies, Sheila Baynes, Kufere Laing, and John Palmer for Oakland and San Diego Unified School Districts as Amicus Curiae on behalf of Defendants and Appellants

                    ACLU Foundation of Northern California, Angélica Salceda; and ACLU Foundation of Southern California, Julia A. Gomez for Caregiver Organization as Amicus Curiae on behalf of Defendants and Appellants

                    Law Office of Chad D. Morgan, Chad D. Morgan for Plaintiffs and Respondents

                    Public Interest Legal Foundation, J. Christian Adams; and Lex Rex Institute, Alexander Haberbush for J. Kenneth Blackwell as Amicus Curiae on behalf of Plaintiffs and Respondents

                    Immigration Reform Law Institute, Lorraine G. Woodwark as Amicus Curiae on behalf of Plaintiffs and Respondents

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JAMES V. LACY et al.,<br><br>    Plaintiffs and Respondents,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO et al.,<br><br>    Defendants and Appellants. | A165899<br><br>(City & County of San Francisco<br>Super. Ct. No. CPF-22-517714) |

In 2016, San Francisco voters amended their city charter to authorize voting in local school board elections by noncitizen parents and guardians of school-age children. In 2022, after multiple school board elections in which noncitizens voted, the underlying lawsuit was brought alleging this charter amendment violated the California Constitution.

We reject the challenge for two reasons. First, neither the plain language of the Constitution nor its history prohibits legislation expanding the electorate to noncitizens. Second, the relevant constitutional provisions authorizing home rule permit charter cities to implement such an expansion in local school board elections. This authority is consistent with the principles underlying home rule and permits the voters of each charter city to determine whether it is good policy for their city or not.

## BACKGROUND

San Francisco (City)[1] is a charter city and county. In 2016, City voters—all United States citizens[2]—approved Proposition N, amending their charter to allow resident noncitizens who are adult parents or guardians of City children under 19 years old to vote in local school board elections.[3]

---

[1] "City" also refers collectively to appellants, the City and County of San Francisco and John Arntz, its Director of Elections.

[2] (S.F. Charter, art. XVII [" 'Voter' shall mean an elector who is registered in accordance with the provisions of state law."].)

[3] The full text of section 13.111 of the San Francisco Charter, which was added by Proposition N, is as follows: "(a) Manner of Election. [¶] (1) Beginning on January 1, 2017, and ending on the sunset date set forth in subsection (a)(2), elections for the Board of Education of the Unified School District shall be conducted in a manner that permits any San Francisco resident to vote who either: [¶] (A) is a voter, as defined in Article XVII of this Charter, or [¶] (B) is the parent, legal guardian, or caregiver (as defined in California Family Code Section 6550 or any successor legislation) of a child under age 19 residing in the San Francisco Unified School District, is the minimum age required under this Charter to vote in a municipal election, and is not disqualified from voting under Article II Section 4 of the California Constitution or any implementing State statute, regardless of whether the person is a United States citizen. [¶] The Board of Supervisors may adopt ordinances implementing this subsection (a)(1). [¶] (2) Subsection (a)(1)(B) authorizing non-citizens to vote in Board of Education elections shall expire by operation of law on December 31, 2022, or on December 31 immediately following the third election for members of the Board of Education conducted in accordance with this Section 13.111, whichever is later. Thereafter, the Board of Supervisors may determine by ordinance whether non-citizens may vote in elections for members of the Board of Education. [¶] (b) Limitations. This Section 13.111 shall apply only to elections for members of the Board of Education of the San Francisco Unified School District. Nothing in this Section 13.111 shall affect the terms of office of members of the Board of Education, including incumbent members on the effective date of the Charter amendment enacting this Section. Nothing in this Section shall alter the definition of 'elector' or 'voter' set forth in Article XVII of this Charter." (Boldface print & fn. omitted.)

Proposition N included a sunset provision but authorized the City's board of supervisors (Board of Supervisors) to continue noncitizen voting in school board elections by ordinance. (S.F. Charter, § 13.111(a)(2).) The ballot pamphlet arguments in favor of Proposition N noted that an estimated one-third of San Francisco public school students have an immigrant parent, Proposition N would increase parental involvement in schools, and increased parental involvement leads to improved educational achievement. (S.F. Voter Information Pamp. (Nov. 8, 2016), proponent's argument in favor of Prop. N, p. 142.)

In 2018, the Board of Supervisors enacted an ordinance implementing Proposition N, including provisions requiring the City's Department of Elections to develop a noncitizen voter registration form for school board elections. (S.F. Ord. No. 128-18, adding art. X, §§ 1001–1005 to S.F. Mun. Code.) Between 2018 and Proposition N's sunset date, the City held three school board elections in which noncitizens voted pursuant to Proposition N. In 2021, in anticipation of Proposition N's sunset date, the Board of Supervisors enacted an ordinance making Proposition N permanent for all future school board elections. (S.F. Ord. No. 206-21, adding art. X, §§ 1000–1000.1 to S.F. Mun. Code.) Following the 2021 ordinance, noncitizens voted in a school board recall election in February 2022.[4]

In March 2022, various plaintiffs (Plaintiffs)[5] filed the underlying complaint and petition for writ of mandate, arguing Proposition N and its

---

[4] The number of noncitizens voting in the school board elections was 59 (November 2018), 2 (November 2019), 31 (November 2020), and 235 (February 2022).

[5] Plaintiffs are James V. Lacy, Michael Denny, the United States Justice Foundation, and the California Public Policy Foundation.

enacting ordinances violate the California Constitution and the Elections Code. Following briefing and a hearing, the trial court granted Plaintiffs' petition and issued a judgment finding the effective ordinance void and unenforceable.[6]

DISCUSSION

I.    *California Constitution*

Article II, section 2, subdivision (a) of the California Constitution[7] states, "A United States citizen 18 years of age and resident in this State may vote." We hereafter refer to this provision as the Citizen Voter Provision. The City argues the provision sets only a floor for voter qualifications, and does not prohibit expanding the electorate to noncitizens.[8] Plaintiffs argue the Constitution also establishes a ceiling, precluding such an expansion.

" ' "The principles of constitutional interpretation are similar to those governing statutory construction. In interpreting a constitution's provisions, our paramount task is to ascertain the intent of those who enacted it. [Citation.] To determine that intent, we 'look first to the language of the constitutional text, giving the words their ordinary meaning.' [Citation.] If the language is clear, there is no need for construction. [Citation.] If the language is ambiguous, however, we consider extrinsic evidence of the

---

[6] The trial court denied the City's motion to stay the judgment pending appeal, filed in anticipation of a November 2022 school board election. This court granted the City's petition for a writ of supersedeas and denied Plaintiffs' subsequent motion for an expedited briefing schedule and an injunction prohibiting the City from certifying the election results until the appeal was resolved.

[7] All undesignated article references are to the California Constitution.

[8] This argument is also advanced in amicus briefs filed by three professors and by two California school districts.

4

enacting body's intent." ' " (*Greene v. Marin County Flood Control & Water Conservation Dist.* (2010) 49 Cal.4th 277, 289–290 (*Greene*).)

The City argues the Citizen Voter Provision's identification of persons who "may vote" does not, by its terms, preclude the expansion of the franchise to noncitizens. The City notes the provision could, but does not, state, "*only*" a United States citizen . . . may vote. Plaintiffs point to a separate provision directing the Legislature to disqualify certain people from voting: "The Legislature shall prohibit improper practices that affect elections and shall provide for the disqualification of electors while mentally incompetent or serving a state or federal prison term for the conviction of a felony." (Art. II, § 4.) Plaintiffs argue the two provisions read together set forth the full parameters of who may and may not vote, precluding the Legislature from expanding the franchise.

In determining whether the Constitution restricts the power to expand the electorate, the relationship between the Constitution and the Legislature is critical. " 'Unlike the federal Constitution, which is a grant of power to Congress, the California Constitution is a limitation or restriction on the powers of the Legislature. [Citations.] Two important consequences flow from this fact. First, the entire law-making authority of the state, except the people's right of initiative and referendum, is vested in the Legislature, and that body may exercise any and all legislative powers which are *not expressly or by necessary implication denied to it by the Constitution*. [Citations.] In other words, "we do not look to the Constitution to determine whether the legislature is authorized to do an act, but only to see if it is prohibited." [Citation.] [¶] Secondly, all intendments favor the exercise of the Legislature's plenary authority: "If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the

5

Legislature's action.  Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used." ' [Citations.]  On the other hand, 'we also must enforce the provisions of our Constitution and "may not lightly disregard or blink at . . . a clear constitutional mandate." ' " (*County of Riverside v. Superior Court* (2003) 30 Cal.4th 278, 284–285 (*County of Riverside*), italics added; see also *Howard Jarvis Taxpayers Assn. v. Padilla* (2016) 62 Cal.4th 486, 498 (*Howard Jarvis*) [" 'It is well established that the California Legislature possesses *plenary* legislative authority except as specifically limited by the California Constitution' "].)

Applying these principles to the Citizen Voter Provision, we agree with the City that the plain language does not restrict the Legislature's discretionary power to expand the electorate to noncitizens.  The Constitution's affirmative identification of who "may vote" does not expressly deny such power.  The additional direction to the Legislature to disqualify certain groups does not necessarily imply that the Constitution rigidly cements the universe of who may and may not vote.  Even if the language was ambiguous as to whether the Constitution restricted the Legislature's power, any " ' "doubt should be resolved in favor of the Legislature's action." ' " (*County of Riverside, supra*, 30 Cal.4th at p. 284.)

Plaintiffs argue we are prevented from reaching such a conclusion by a 19th century decision, *Spier v. Baker* (1898) 120 Cal. 370 (*Spier*).  *Spier* interpreted the following constitutional language:  "Every native male citizen of the United States, every male person who shall have acquired the rights of citizenship under or by virtue of the treaty of Queretaro,[9] and every male

_____

9  The Treaty of Queretaro, also known as the Guadalupe Hidalgo Treaty, ended the Mexican–American War in 1848.  (Ballentine's Law

naturalized citizen thereof, who shall have become such ninety days prior to any election, of the age of twenty-one years, who shall have been resident of the State one year next preceding the election, and of the county in which he claims his vote ninety days, and in the election precinct thirty days, shall be entitled to vote at all elections which are now or may hereafter be authorized by law; *provided*, no native of China, no idiot, no insane person, no person convicted of any infamous crime, no person hereafter convicted of the embezzlement or misappropriation of public money, and no person who shall not be able to read the Constitution in the English language and write his name, shall ever exercise the privileges of an elector in this State . . . ." (Former art. II, § 1.)

*Spier* considered a statute that authorized voting in primary elections by persons "who have been legal residents of the county for thirty days prior to the election" and by "citizens made so by naturalization upon the day next preceding the election," instead of the ninety day period for county residence and naturalization required by the Constitution. (*Spier*, *supra*, 120 Cal. at p. 376.) The Supreme Court held the statute was "void, as being in *direct contravention* of the constitution of the state. This contravention of the constitution consists in this, that a legal residence in the county alone for thirty days prior to the election is the only condition required by the act, whereas the constitution requires a legal residence in the state for one year, and in the county ninety days, and in the precinct thirty days. This legislation is also in contravention of the constitution in this, that the naturalized citizen under the constitution is not entitled to vote unless his

Dictionary [entry for "Guadalupe Hidalgo Treaty"]; see also *Anderson v. Mathews* (1917) 174 Cal. 537, 539.)

naturalization occurred at least ninety days prior to the day of election." (*Id.* at p. 377, italics added.)

Spier is distinguishable. The Constitution then expressly set forth the specific time periods before an election that naturalization and residence must take place. The granular specificity of these requirements necessarily implied the Legislature was prohibited from authorizing shorter time periods directly contradicting the Constitution. The language in the Citizen Voter Provision is clearly dissimilar; whatever the wisdom of Proposition N, it simply does not expressly or by necessary implication directly contravene the Citizen Voter Provision.

Plaintiffs emphasize the following discussion in *Spier*: "[The] legislation is not a curtailment of the constitutional right of suffrage, but an enlargement of that right. That is, the legislature has attempted to extend the right of suffrage to certain classes of citizens outside of those classes mentioned in the constitution. If the legislature has such power, it could extend the right to aliens, to minors, to women. It has no such power. The legislature can no more extend the right of suffrage to persons not included in the constitutional provision than it can deprive persons there included of the right. The application of the maxim, '*Expressio unius est exclusio alterius*,'[10] bears with full force upon this provision of the constitution declaring who are competent to vote at elections authorized by the laws of this state." (*Spier*, *supra*, 120 Cal. at pp. 376–377.)

---

[10] Under "the interpretive canon *expressio unius est exclusio alterius*, . . . the explicit mention of some things in a text may imply other matters not similarly addressed are excluded." (*Howard Jarvis, supra*, 62 Cal.4th at p. 514.)

*Spier*'s comment that the Legislature had no power to expand the franchise "to aliens, to minors, to women"—prospects the *Spier* court apparently found preposterous—was dicta. "As an intermediate appellate court, we do not lightly disregard dictum from our Supreme Court. ' "Even if properly characterized as dictum, statements of the Supreme Court should be considered persuasive. [Citation.]" ' [Citation.] 'When the Supreme Court has conducted a thorough analysis of the issues and such analysis reflects compelling logic, its dictum should be followed.' " (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 330 (*Bigler-Engler*).) However, we "may reject [Supreme Court] dicta that 'does not, in our opinion, "reflect[ ] compelling logic." ' " (*Areso v. CarMax, Inc.* (2011) 195 Cal.App.4th 996, 1006.)

*Spier*'s assertion that the Constitution divested the Legislature of the power to expand the electorate to noncitizens reflects neither a thorough analysis nor compelling logic. The court's only explanation was its reliance on the *expressio unius* canon, but the application of the canon in this context has since been questioned by the Supreme Court, which held that where a "constitutional provision[] . . . involves not a grant of authority but a limitation on legislative power," it is inappropriate "to infer from a few specific limits on legislative authority the *presence* of a broader, unstated limit on legislative authority." (*Howard Jarvis, supra*, 62 Cal.4th at p. 515; see also *id.* at p. 551 (conc. opn. of Corrigan, J.) [" 'The people, in their Constitution, may place restrictions upon the exercise of the legislative power by the Legislature but the courts may not do so without violating the fundamental separation of powers doctrine. . . . [L]egislative restraint imposed through judicial interpretation of less than unequivocal language would inevitably lead to inappropriate judicial interference with the prerogatives of a coordinate branch of government. Accordingly, the only

9

judicial standard commensurate with the separation of powers doctrine is one of strict construction to ensure that restrictions on the Legislature are in fact imposed by the people rather than by the courts in the guise of interpretation.' "].)

*Howard Jarvis* rejected the argument that three constitutional provisions requiring the Legislature to place measures on the ballot for voter approval demonstrate the Legislature was precluded from doing so in other circumstances: "The *expressio unius* canon, were we to apply it here, would at most support the inference that the three cited instances are an exhaustive list of the circumstances in which submission of a matter to a plebiscite is mandatory," but "offer[s] no guidance at all on . . . whether the Legislature in its discretion *may* turn to the voters to ascertain their will concerning" other matters. (*Howard Jarvis*, *supra*, 62 Cal.4th at p. 515.) *Howard Jarvis*'s discussion of the application of *expressio unius* to constitutional provisions limiting Legislative power is both more recent and more compelling than *Spier*'s unpersuasive dictum, and we therefore decline to follow the latter. (*Bigler-Engler*, *supra*, 7 Cal.App.5th at p. 330 [declining to follow unpersuasive Supreme Court dictum].)

Further support for our construction of the Citizen Voter Provision is found in its history. In 1926, the language disqualifying "native[s] of China"—present at the time of *Spier*—was replaced with language disqualifying "alien[s] ineligible to citizenship."[11] (Ballot Pamp., Gen. Elec.

---

[11] " '[A]lien[s] ineligible to citizenship' . . . was a euphemism for Asians." (Chin, *The Civil Rights Revolution Comes to Immigration Law: A New Look at the Immigration and Nationality Act of 1965* (1996) 75 N.C. L.Rev. 273, 281–282, fn. omitted; see also *Terrace v. Thompson* (1923) 263 U.S. 197, 220 ["Generally speaking, the natives of European countries are eligible. Japanese, Chinese and Malays are not"].)

10

(Nov. 2, 1926), Prop. 13 proposed amendment, p. 20, italics omitted.) This amendment prohibited the Legislature from enfranchising noncitizens who were not eligible for citizenship—a *subset* of all noncitizens. If the Constitution already prohibited the Legislature from enfranchising any noncitizens, there would have been no reason for the voters to adopt such language. Instead, the amendment implicitly acknowledged the Legislature's power to enfranchise those noncitizens who were eligible for citizenship.[12] In 1972, the "alien[s] ineligible for citizenship" disqualification was, itself, deleted from the Constitution (along with numerous other changes), thereby removing that limitation on the Legislature's discretionary authority to expand the franchise to noncitizens. (Ballot Pamp., Gen. Elec. (Nov. 7, 1972), Prop. 7 proposed amendments, p. 9.)

In sum, our analysis is governed by the directive that the Legislature retains " 'any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution.' " (*County of Riverside, supra*, 30 Cal.4th at p. 284.) The Citizen Voter Provision's definition of who "may vote" does not expressly or by necessary implication prohibit the Legislature from expanding the electorate to noncitizens.

---

[12] The ballot pamphlet for this amendment was adopted as part of a proposition effecting other changes to the provision, and the arguments in the ballot pamphlet discuss solely those other aspects and do not mention this change. (Ballot Pamp., Gen. Elec. (Nov. 2, 1926), Prop. 13 arguments, p. 18.) However, context may be provided by the fact that, historically, it was not uncommon for states to enfranchise some noncitizens. (See *Minor v. Happersett* (1874) 88 U.S. 162, 177 ["[C]itizenship has not in all cases been made a condition precedent to the enjoyment of the right of suffrage. Thus, in Missouri, persons of foreign birth, who have declared their intention to become citizens of the United States, may under certain circumstances vote. The same provision is to be found in the constitutions of Alabama, Arkansas, Florida, Georgia, Indiana, Kansas, Minnesota, and Texas."].)

11

The question remains whether *charter cities* may do so. Plaintiffs argue that "even if [the Citizen Voter Provision] allows for expansion of voting rights, the power to do so is reserved to the Legislature and cannot be exercised by the City . . . ." Finding that the Citizen Voter Provision does not prohibit the Legislature from expanding the electorate to noncitizens is not equivalent to finding that charter cities have that same authority. Unlike the Legislature, which is vested with "any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution" (*County of Riverside*, *supra*, 30 Cal.4th at p. 284), the power of charter cities derives from "an 'affirmative constitutional grant.' " (*State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 556 (*State Building*).) Two relevant provisions of the Constitution grant power to charter cities.

Article IX, section 16, subdivision (a), provides, "It shall be competent, in all charters framed under the authority given by Section 5 of Article XI, to provide, in addition to those provisions allowable by this Constitution, and by the laws of the state for the manner in which, the times at which, and the terms for which the members of boards of education shall be elected or appointed, for their qualifications, compensation and removal, and for the number which shall constitute any one of such boards."[13] We hereafter refer to this provision as the Charter City School Board Provision.

Article XI, section 5, expressly referenced in the Charter City School Board Provision, provides: "(a) It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all

---

[13] "[T]he board of education provided for in a city charter is the 'governing board' of the relevant school district." (*Mendoza v. State of California* (2007) 149 Cal.App.4th 1034, 1041 (*Mendoza*).)

12

ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws.  City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith. [¶] (b) It shall be competent in all city charters to provide, in addition to those provisions allowable by this Constitution, and by the laws of the State for: (1) the constitution, regulation, and government of the city police force (2) subgovernment in all or part of a city (3) conduct of city elections and (4) plenary authority is hereby granted, subject only to the restrictions of this article, to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and the terms for which the several municipal officers and employees whose compensation is paid by the city shall be elected or appointed, and for their removal, and for their compensation, and for the number of deputies, clerks and other employees that each shall have, and for the compensation, method of appointment, qualifications, tenure of office and removal of such deputies, clerks and other employees."  We hereafter refer to this provision as the Home Rule Provision.

When considering multiple "provisions . . . in the California Constitution, . . . we must view them together as a whole and not in isolation."  (*County of Riverside*, *supra*, 30 Cal.4th at p. 285.)  "Related provisions [of the Constitution] 'should be read together and construed in a manner that gives effect to each, yet does not lead to disharmony with the others.' "  (*Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 218.)

The Charter City School Board Provision confers authority on charter cities to determine the "manner in which" school board members "shall be

13

elected . . . ." As our Supreme Court has acknowledged, "the term 'election' is a general one in which many variations are possible . . . ." (*Greene*, *supra*, 49 Cal.4th at p. 297; see also *ibid*. ["There is no reason to suppose that the term 'election' has a core meaning of ballot secrecy when the specific constitutional provisions authorizing the election indicate otherwise"].) The question before us is whether the term "manner" encompasses the authority to determine voter qualifications.

The Supreme Court has indicated that "manner" as used in the Home Rule Provision should not be narrowly construed. *Johnson v. Bradley* (1992) 4 Cal.4th 389 (*Johnson*) considered whether a charter city ordinance providing for partial public funding of city political campaigns was barred by a state law banning public financing of elections. The Supreme Court expressed "reluctan[ce]" to adopt "the narrow scope of the word 'manner' " urged by the challengers, which would "exclude all local election regulations except those that may be labeled 'procedural.' "[14] (*Id.* at pp. 392–393, 403.) Although the court ultimately avoided the issue (*id.* at p. 404), the opinion suggests the term should be construed broadly, to include substantive aspects of elections. (See also *Cawdrey v. City of Redondo Beach* (1993) 15 Cal.App.4th 1212, 1227 [declining to adopt "narrow interpretation" of manner as "regulating election *procedures* only"].)

In addition, the interrelated histories of the Home Rule Provision and the Charter City School Board Provision indicate an underlying intent to

---

[14] The court also expressed hesitance to adopt the city's argument "that partial public financing of municipal election campaigns is 'one way to elect municipal officials.' " (*Johnson*, *supra*, 4 Cal.4th at p. 403.) Because campaign finance regulations are significantly more attenuated from the "manner" of elections than voter qualifications, this reluctance is not material to the issue before us.

confer expansive authority on charter cities in those areas deemed to be within their purview, suggesting the language of the provisions should be construed broadly to further that intent. "The roots of [the Home Rule Provision] trace back more than 100 years. [Citation.] It was originally 'enacted upon the principle that the municipality itself knew better what it wanted and needed than the state at large, and to give that municipality the exclusive privilege and right to enact direct legislation which would carry out and satisfy its wants and needs.' [Citation.] The provision represents an 'affirmative constitutional grant to charter cities of "all powers appropriate for a municipality to possess . . . ." ' " (*State Building*, *supra*, 54 Cal.4th at pp. 555–556.)

Historically, the authority now conferred separately by the Home Rule Provision and the Charter City School Board Provision was conferred together in the same constitutional section. The first home rule provision, adopted in 1896, "contained four permissive subdivisions . . . authorizing city charters to provide for: (a) police courts, (b) selection of boards of education, (c) control and regulation of police, and (d) selection and regulation of boards of election." (Van Alstyne, Background Study Relating to Article XI, Local Government, Cal. Const. Revision Com., Proposed Revision (1966) p. 278 (hereafter, Background Study).)[15] As explained by an "authoritative

---

[15] The full text of the original article XI, section 8 1/2 provided: "It shall be competent, in all charters framed under the authority given by section eight of article eleven of this Constitution, to provide, in addition to those provisions allowable by this Constitution and by the laws of the State, as follows: [¶] 1. For the constitution, regulation, government, and jurisdiction of Police Courts, and for the manner in which, the times at which, and the terms for which the judges of such courts shall be elected or appointed, and for the compensation of said judges and of their clerks and attachés. [¶] 2. For the manner in which, the times at which, and the terms

15

commentator" (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 17 (*CalFed*)), the provision was "promulgated to assure local control of the described subjects" and, with respect to school board members, "to clarify the law, since the pre-1896 cases appeared to regard public education as a matter of state wide concern for some purposes [citation] but a municipal function for others." (Background Study, at p. 279.) In 1911, the provision was amended to "enlarge[]" charter city authority over school board members to include their " 'qualifications, compensation, and removal.' " (*Id.*, at p. 280.)

Thus, the history of home rule in the California Constitution demonstrates an intent to confer broad authority on charter cities over municipal affairs generally. Construing the term "manner" in the Charter City School Board Provision as encompassing the authority to expand the electorate for school board elections furthers that intent and is consistent with the purposes underlying home rule: school district elections generally

---

for which the members of boards of education shall be elected or appointed, and the number which shall constitute any one of such boards. [¶] 3. For the manner in which, the times at which, and the terms for which the members of the boards of police commissioners shall be elected or appointed; and for the constitution, regulation, compensation, and government of such boards and of the municipal police force. [¶] 4. For the manner in which, the times at which, and the terms for which the members of all boards of election shall be elected or appointed, and for the constitution, regulation, compensation, and government of such boards, and of their clerks and attachés; and for all expenses incident to the holding of any election. [¶] Where a city and county government has been merged and consolidated into one municipal government, it shall also be competent in any charter framed under said section eight of said article eleven, to provide for the manner in which, the times at which, and the terms for which the several county officers shall be elected or appointed, for their compensation, and for the number of deputies that each shall have, and for the compensation payable to each of such deputies." (Former art. XI, § 8 1/2 (1897).)

16

involve local issues and have entirely local impacts. Thus, it makes sense to confer on charter cities the authority to expand the electorate where, as here, the city's voters determine that doing so would better serve local needs. Conversely, where a charter city's electorate determines expanding the electorate would not serve its local needs, it need not do so. Indeed, restricting local governments' ability to expand the electorate for school board elections "may hamper the creation of innovative local government units" and prevent citizens from " 'devising mechanisms of local government suitable for local needs and efficient in solving local problems' " (*Bjornestad v. Hulse* (1991) 229 Cal.App.3d 1568, 1592 (*Bjornestad*) [discussing appropriate standard of review for vote dilution challenge to franchise expansion])— precisely the kind of harm that California citizens sought to prevent in enacting and expanding charter city home rule authority.[16]

Further support for this construction is found in the related statutory scheme. The Education Code contains a chapter titled, "Conduct of Elections," which includes a provision governing voter qualifications: "In any school district or community college district election, the qualifications of voters . . . shall be governed by those provisions of the Elections Code applicable to statewide elections." (Ed. Code, § 5390.) However, the chapter also includes a section restricting the applicability of its provisions where

---

[16] Subsidiarity is a political theory that encourages decision making on issues at the most local level consistent with their resolution. (See Oxford English Dict. (3d ed.) [defining "subsidiarity" as "the principle that a central authority should have a subsidiary function, performing only those tasks which cannot be performed effectively at a more immediate or local level"].) The Home Rule Provision and the Charter City School Board Provision are consistent with that principle, which recognizes that what might be a good rule for San Francisco may not be one for charter cities in other parts of the state, and that the local voters should be the ones who decide.

17

contrary election rules are set out in a city's charter: "The provisions of this chapter shall apply to all district elections, except as otherwise provided by law, *or as otherwise provided in the charter of any city or city and county in the matters concerning which the provisions of such charters are afforded controlling force and effect by the Constitution* or laws of the state." (Ed. Code, § 5301, italics added.) Thus, the statutory scheme accommodates the possibility that charter cities would expand the electorate for school board elections beyond that provided for by state law.[17] This implicit legislative recognition that "manner" as used in the Charter City School Board Provision may include voter qualifications is significant in light of the "settled principle of construction" affording a "strong presumption in favor of the Legislature's interpretation of a provision of the Constitution." (*Methodist Hosp. of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 692.) This principle directs that " '[w]hen the Constitution has a doubtful or obscure meaning or is capable of various interpretations, the construction placed thereon by the Legislature is of very persuasive significance.' " (*Id.* at p. 693; accord, *Mt. San Jacinto Community College Dist. v. Superior Court* (2007) 40 Cal.4th 648, 656.)

In arguing against this construction, Plaintiffs rely on a host of contentions that we find unavailing. First, Plaintiffs point to *People ex rel. Devine v. Elkus* (1922) 59 Cal.App. 396 (*Elkus*), which considered a challenge to a charter city's system of ranked voting for a nine-member city council

---

[17] The Legislature has elsewhere used the term "manner" to suggest it includes voter qualifications, albeit outside of the school board context. (See West's Ann. Wat.–Appen., § 106-7 ["the directors shall be elected in the *manner* prescribed for general elections in reclamation districts as set forth in Division 15 (commencing with Section 50000) of the Water Code" (italics added)]; Wat. Code, § 50016 [part of Div. 15: " 'Voter' means a landowner or the legal representative of a landowner"].)

whereby each ballot was counted for no more than one council candidate. (*Id.* at p. 397.) The Court of Appeal held "[t]he election of nine members of the city council is the election of persons to nine offices as fully as if the offices were distinct in name and in the duties to be discharged," and therefore the charter city's system was "violative of the elector's constitutional right to vote at all elections." (*Id.* at pp. 399, 407.) *Elkus* thus considered a charter city's *restriction* of voting rights, specifically, a system that effectively prevented voters from casting a ballot for each open office. In considering this issue, the court rejected the argument that a charter city's authority to determine the "manner" of election for municipal officers encompassed the authority to abridge the right to vote: "[B]y the adoption of section 8 1/2 [the original home rule provision], the people have not 'expressed with irresistible clearness' an intention to infringe and overthrow the fundamental right guaranteed by the constitution to every qualified elector of voting at all elections." (*Id.* at p. 405.) The issue decided in *Elkus* is not before us.

As Plaintiffs emphasize, *Elkus* included quotes from out-of-state cases and dicta suggesting that "manner" does not encompass a determination of voter qualifications. (*Elkus, supra,* 59 Cal.App. at pp. 404–405.) But this was not the issue before that court. (*Id.* at p. 397 ["The only question presented by this appeal is whether such proportional representation system is constitutional"].) "As we have repeatedly observed, ' "cases are not authority for propositions not considered." ' " (*B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 11.) *Elkus* does not direct a narrow reading of the term "manner."[18]

---

[18] Plaintiffs' contention that voters knew "manner" did not include voter qualifications when they adopted the Charter City School Board Provision because *Elkus* had already been decided is contradicted by the history,

19

Plaintiffs rely on the canon of interpretation that "a word may be defined by its accompanying words and phrases, since 'ordinarily the coupling of words denotes an intention that they should be understood in the same general sense.' " (*California Farm Bureau Federation v. California Wildlife Conservation Bd.* (2006) 143 Cal.App.4th 173, 189.) Plaintiffs argue that "manner" is accompanied by "times" and "terms," words which do not suggest an expansive meaning. But "times" and "terms" are not the only accompanying words and phrases: the grouping also confers authority on charter cities to determine the "qualifications" of school board members. Qualifications of voters and qualifications of candidates for elective office are of a similar type. For example, the Constitution provides, "The right to *vote or hold office* may not be conditioned by a property qualification." (Art. I, § 22, italics added.) This grouping thus supports a construction of "manner" to encompass the authority to expand the electorate.[19]

Plaintiffs suggest the Charter City School Board Provision should be narrowly construed because education is a statewide concern. As a general matter, it is well-established that education is a statewide concern. "[T]he California Constitution makes public education uniquely a fundamental

related above, demonstrating the provision granting charter cities authority to determine the "manner" of electing school board members was originally adopted in 1896, long before *Elkus* was decided.

[19] Plaintiffs' argument regarding the use of "manner" in the United States Constitution, which appears in the more limited grouping "Times, Places and Manner" (U.S. Const. art. I, § 4, cl. 1), is therefore inapposite. Similarly, *Libertarian Party v. Eu* (1980) 28 Cal.3d 535, relied on by Plaintiffs, which discussed federal cases in determining whether a statute governing the party identification of candidates "constitutes an unconstitutional impairment of the fundamental rights to associate for political activity and to vote" (*id.* at p. 542), is not relevant to the issue before us.

concern of the State . . . ." (*Butt v. State of California* (1992) 4 Cal.4th 668, 685.) "[E]ducation and the operation of the public schools remain matters of statewide rather than local or municipal concern. [Citations.] Hence, local school districts are deemed to be agencies of the state for the administration of the school system and have been described as quasi-municipal corporations." (*California Teachers Assn. v. Hayes* (1992) 5 Cal.App.4th 1513, 1524.) "The Legislature's power over the public school system has been variously described as exclusive, plenary, absolute, entire, and comprehensive, *subject only to constitutional constraints*." (*Ibid.*, italics added.)

One of these "constitutional constraints" is the Charter City School Board Provision, that expressly confers on charter cities certain authority over local school board members. "Management and control of the public schools is a matter of state care and supervision; local districts are the state's agents for local operation of the common school system. [Citation.] [¶] However, certain powers of local districts *are* enshrined in the California Constitution. Thus, [the Charter City School Board Provision] *guarantees* to charter cities the right to provide 'for the manner in which, the time at which, and the terms for which members of boards of education shall be elected or appointed, for their qualifications, compensation and removal, and for the number which shall constitute any one of such boards.' " (*Mendoza, supra,* 149 Cal.App.4th at p. 1052.)

As Plaintiffs argue, the Charter City School Board Provision appears in the article governing education, rather than the article governing local government. However, as noted above, authority over the manner of electing school board members was part of the original home rule provision. Prior to its transfer to the education article, a 1966 report for the Constitution

21

Revision Commission recommended the provision be retained "to encourage experimentation and variation in school district organization." (Allen & Briner, A Study of the Educational Provisions of the California State Constitution (1966) p. 41.)[20] The 1970 voter pamphlet for the ballot proposition moving the provision out of the local government article (among numerous other changes) indicated no substantive change was intended: "No change is made in the existing powers of the Legislature or local governments to deal with regional problems. No additional legislative power in this area is provided by Proposition 2. [¶] Proposition 2 takes some powers from the Legislature and gives it back to the local communities in appropriate areas, thus strengthening local government." (Ballot Pamp., Prim. Elec. (June 2, 1970), rebuttal to argument against Prop. 2, p. 8.) Similarly, when the provision was moved to the education article two years later, the legislative counsel's analysis stated the proposition would "transfer[], **without substantive change**," various provisions, including the new article IX, section 16, the Charter City School Board Provision. (Ballot Pamp., Prim. Elec. (June 6, 1972), detailed analysis by the legislative counsel of Prop. 10, p. 25.)

Plaintiffs argue that, even if the City can expand the electorate in elections for municipal officers, it cannot do so in school board elections. Plaintiffs point to the Home Rule Provision's use of the word "plenary" to characterize the authority conferred over the manner of electing or appointing municipal officers and employees, in contrast to the Charter City

---

[20] The recommendation of a different commentator that "consideration should be given to the desirability and propriety of eliminating" charter city authority over the manner of selection of school board members (Background Study, p. 286), did not prevail.

School Board Provision. (Compare Charter City School Board Provision ["It shall be competent, in all charters framed under the authority given by [the Home Rule Provision], to provide, in addition to those provisions allowable by this Constitution, and by the laws of the state for the manner in which, the times at which, and the terms for which the members of boards of education shall be elected or appointed"], with Home Rule Provision ["(b) It shall be competent in all city charters to provide, in addition to those provisions allowable by this Constitution, and by the laws of the State for: . . . (4) *plenary authority* is hereby granted, subject only to the restrictions of this article, to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and the terms for which the several municipal officers and employees whose compensation is paid by the city shall be elected or appointed" (italics added)].) Plaintiffs rely on the principle that " ' "[w]here different words or phrases are used in the same connection in different parts of a statute, it is presumed the Legislature intended a different meaning." ' " (*Ferra v. Loews Hollywood Hotel, LLC* (2021) 11 Cal.5th 858, 866.)

The argument is unpersuasive for two reasons. First, the word "plenary" modifies the *authority* conferred, but the relevant issue here is whether the word "manner" encompasses an expansion of the electorate. Whether a charter city's authority over the manner of an election is plenary or not leaves unaffected the meaning of the word "manner."

Second, the legislative history does not indicate that the addition of the word "plenary" was intended to distinguish a charter city's substantive authority in that area from its authority in other areas identified by the Constitution. Before the 1914 addition of "plenary," the home rule provision provided for a charter city's authority over the manner of election or

23

appointment of school board members and, in a separate provision, provided a consolidated city and county's authority over the manner of election or appointment of "the several county and municipal officers and employees whose compensation is paid by such city and county . . . ."[21] (Ballot Pamp., Gen. Elec. (Nov. 3, 1914), existing law relating to Prop. 19, p. 92.) The latter provision was amended in 1914 to apply to "*any city or* consolidated city and county," and the phrase, "and plenary authority is hereby granted" was added.[22] (Ballot Pamp., Gen. Elec. (Nov. 3, 1914), proposed law for Prop. 19, p. 90.) The word "plenary" was not added with respect to any other authority conferred in the home rule provision.

The arguments in favor of the 1914 amendment explained the proposed amended subdivision "is identical with the present subdivision, except that it is worded to make it certain that all cities as well as consolidated cities and counties shall have the right to provide in their charters for the election,

---

[21] In relevant part, this provision read, "Where a city and county government has been merged and consolidated into one municipal government, it shall also be competent, in any charter framed under said section eight of said article eleven, or by amendment thereto, to provide for the manner in which, the times at which and the terms for which the several county and municipal officers and employees whose compensation is paid by such city and county . . . shall be elected or appointed . . . ." (Ballot Pamp., Gen. Elec. (Nov. 3, 1914), existing law relating to Prop. 19, p. 92, italics omitted.)

[22] In relevant part, the amended provision read, "It shall be competent in any charter framed in accordance with the provisions of this section, or by section eight of this article, for any city or consolidated city and county, and plenary authority is hereby granted, subject only to the restrictions of this article, to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and the terms for which the several county and municipal officers and employees whose compensation is paid by such city or city and county . . . shall be elected or appointed . . . ." (Ballot Pamp., Gen. Elec. (Nov. 3, 1914), proposed law for Prop. 19, p. 90.)

24

terms of office, compensation and removal of their officials and employees."
(Ballot Pamp., Gen. Elec. (Nov. 3, 1914), argument in favor of Prop. 21, p.
88;[23] see also Background Study, p. 281 [relevant 1914 amendment "was
intended to 'make it certain' that charter cities, being omitted from the
language of the 1911 provision [granting a consolidated city and county
authority over the manner of election or appointment of its officers and
employees], would not be construed to have less authority than consolidated
municipalities"].)  In *Johnson*, *supra*, the Supreme Court indicated the
addition of "plenary," along with other amendments, was to address the issue
of " 'bulky charters' " resulting from previous judicial constructions finding
"laws regulating municipal elections and compensation of municipal officers
. . . could be given no effect if the city charter was silent on that subject."
(*Johnson*, *supra*, 4 Cal.4th at pp. 396–397.)

Because "plenary" modifies authority, not manner, and because there is
no indication that its addition was intended to distinguish the substance of a
charter city's authority over municipal elections from that of a charter city's
authority over school board elections, we are not persuaded that the
Constitution grants charter cities less authority in determining the nature of
the electorate with respect to school board members than as to municipal
officers.  Thus, we reject Plaintiffs' argument that, even if a charter city can
expand the franchise for municipal officer elections, it cannot do so for school
board elections.

---

[23] Although this argument was made with respect to a competing,
unsuccessful proposition proposing amendments to the same constitutional
provision, the argument addressed proposed language identical to that
adopted by the voters.  (Compare Ballot Pamp., Gen. Elec. (Nov. 3, 1914),
Prop. 21, proposed subd. 4, p. 85, with *id.*, Prop. 19, proposed subd. 4, p. 90.)

Plaintiffs argue a construction that allows charter cities to expand the franchise for school board elections could lead to absurd consequences, such as allowing Texas residents to vote in such elections. We doubt such an expansion would survive challenges under other constitutional provisions. (See *Day v. Robinwood West Community Improvement Dist.* (E.D. Mo. 2010) 693 F.Supp.2d 996, 1005 (*Day*) ["courts facing vote dilution claims have held that a legislature's decision to expand the electorate is irrational and therefore unconstitutional where the enfranchised voters do not have a 'substantial interest' in the outcome of the election"].) In any event, Plaintiffs' contention that the construction we adopt will lead to bad policy is, like the City's contention that it will lead to good policy,[24] not material to the legal issue before us. "It is not our province to approve good legislation and condemn bad legislation. . . . [T]he remedy for unwise legislation is not with the courts, but with the people. In the present proceeding, it is our duty alone to pass upon the validity of this act, tested by the various provisions of the constitution of the state." (*Spier*, *supra*, 120 Cal. at p. 372.)

Though the Charter City School Board Provision contains no express grant of authority to expand the franchise, the provision is a broad grant of power to a charter city to determine how to select school board members. A charter city's authority over the "manner" of school board member elections under the Charter City School Board Provision encompasses the authority to expand the electorate implemented by Proposition N.[25] Because the voter-

---

[24] Policy arguments in favor of Proposition N are also advanced in amicus briefs filed by three professors and filed on behalf of a number of nonprofit community organizations.

[25] The City argues in the alternative that Proposition N is authorized by the Charter City School Board Provision's grant of power to appoint school

approved Proposition N validly exercised this authority to expand the electorate for school board elections to include noncitizen parents and guardians of City children, we reverse the trial court's ruling declaring Proposition N void and unenforceable.[26]

This conclusion does not leave charter cities with limitless authority to determine the electorate for school board elections or, for that matter, the election of other municipal officials. "[E]ven if a given matter is deemed to be a municipal affair, a charter city's regulation remains subject to the various guarantees and requirements of the state and federal Constitutions." (*Johnson*, *supra*, 4 Cal.4th at p. 403, fn. 15.) Our conclusion leaves intact the application of other constitutional "guarantees and requirements," for example, the state and federal equal protection clauses (see *post*, part III). No party argues Proposition N was motivated by a desire to favor or disfavor any particular racial or ethnic group, and whether and how such evidence would impact the constitutionality of the proposition is thus not before us.[27] Similarly, as Proposition N expanded the franchise, we do not opine on

board members. (See *Wheeler v. Herbert* (1907) 152 Cal. 224, 232.) Because we uphold Proposition N pursuant to the City's authority to determine the "manner" in which school board members are elected, we need not and do not decide whether it can also be upheld under the City's alternative argument.

[26] As noted above (fn. 12, *ante*), noncitizen voting in state and/or local elections is not without historical precedent. Nor is it without precedent today. (See 18 U.S.C. § 611, subd. (a) [prohibiting noncitizens from voting in federal elections unless "the election is held partly for some other purpose" and noncitizens "are authorized to vote for such other purpose under a State constitution or statute or a local ordinance"]; *Ferry v. City of Montpelier* (Vt., Jan. 20, 2023) 2023 VT 4 [Vermont Constitution does not prohibit noncitizen voting in local elections].)

[27] We address equal protection vote dilution claims raised by amici below (*post*, part III).

charter cities' ability to narrow it. We decide today solely the issue before us: the Constitution confers on the City the authority to expand the electorate for school board elections to include noncitizen parents or guardians of City children.

II.    *State Law*

State statutes generally provide that voters in school district elections must be citizens. (See Ed. Code, § 5390 ["In any school district . . . election, the qualifications of voters . . . shall be governed by those provisions of the Elections Code applicable to statewide elections"]; Elec. Code, § 2101, subd. (a) ["A person entitled to register to vote shall be a United States citizen"].) Such statutes, if applicable, would conflict with Proposition N.

However, as discussed above, the Education Code expressly exempts from these provisions school board elections where the city charter provides otherwise as to matters "afforded controlling force and effect by the Constitution." (Ed. Code, § 5301 ["The provisions of this chapter [including Ed. Code, § 5390] shall apply to all district elections, except as otherwise provided by law, or as otherwise provided in the charter of any city or city and county in the matters concerning which the provisions of such charters are afforded controlling force and effect by the Constitution or laws of the state"].) Because we conclude the Charter City School Board Provision "afford[s] controlling force and effect" to Proposition N, state law does not conflict with Proposition N.[28]

---

[28] Because we are not presented with a conflicting state law, we need not and do not decide whether Proposition N implicates a municipal affair or a statewide concern under the analytical test set forth in *CalFed, supra,* 54 Cal.3d at pages 16–17. (See *id.* at p. 16 [if there is no "actual conflict between" a state statute and charter city measure, "a choice between the conclusions 'municipal affair' and 'statewide concern' is not required"].)

III.	*Vote Dilution*

In an amicus curiae brief, the Immigration Law Reform Institute (IRLI) raises an argument not advanced by the parties, that Proposition N violates the equal protection clauses of the United States Constitution and the California Constitution by impermissibly diluting the votes of citizens.  (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7; *Reynolds v. Sims* (1964) 377 U.S. 533, 555 ["the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise"].)

" 'Generally courts will only consider issues properly raised by the parties on appeal.  [Citations.]  However, the Supreme Court has recognized two exceptions to this rule,' " including that, " 'under the theory that an appeal should be affirmed if the judgment is correct on any theory, amicus curiae may raise an issue which will support affirmance.' " (*Sacramento County Employees' Retirement System v. Superior Court* (2011) 195 Cal.App.4th 440, 473.)  Because IRLI's constitutional argument supports affirmance of the judgment, we will consider the new argument.

When a claim of vote dilution is based on an expansion of the electorate, lower federal courts have overwhelmingly applied rational basis review.  (See *Day*, *supra*, 693 F.Supp.2d at p. 1005 ["Courts confronting equal protection claims asserting vote dilution resulting from expansion of the voter base have generally employed a standard at the rational basis end of the . . . spectrum" (citing cases; fn. omitted)]; *May v. Town of Mountain Village* (D. Colo. 1996) 944 F.Supp. 821, 824 (*May*) ["Where a law expands the right to vote causing voting dilution, the rational basis test has been applied by the vast majority of courts." (collecting cases)], affd. (10th Cir. 1997) 132 F.3d

29

576.)[29] "While the lower federal courts' decisions do not bind us, we give them 'great weight' when they reflect a consensus, as they do here." (*Coral Construction, Inc. v. City and County of San Francisco* (2010) 50 Cal.4th 315, 329–330.)

As explained by one California court, "The rational basis test is employed in these federal cases for a number of reasons. First, these cases . . . do not concern electoral schemes that deny the franchise to citizens who are otherwise qualified by residence and age. [Citation.] . . . In the rational basis cases, the election laws expand rather than restrict the franchise. [Citation.] . . . [O]verinclusiveness is a lesser constitutional evil than underinclusiveness. [Citation.] . . . Also flowing from the . . . contrast [between cases applying strict scrutiny and rational basis review] is the issue of the nature of the governmental entity involved—is it a district of limited purpose and powers or a body exercising general governmental powers? [Citations.] Related to this inquiry is another substantial concern—that a strict scrutiny approach may hamper the creation of innovative local government units. . . . 'The Constitution does not require that a uniform

---

[29] *May* and *Day* are examples of this general rule. In *May*, a Colorado town "extend[ed] the right to vote in its municipal elections to people located throughout the United States and possibly abroad who own property in the Town but who do not reside in the Town." (*May, supra*, 944 F.Supp. at p. 822.) The district court found rational basis review applied to a vote dilution challenge because the scheme "expands the right to vote and equally weighs the votes of all allowed to vote." (*Id.* at p. 824.) In *Day*, a Missouri law allowed both residents and nonresident property owners to vote in community improvement district elections. (*Day, supra*, 693 F.Supp.2d at p. 1004.) In considering the argument that property owner voters did not have to be citizens or residents, the court held, "this classification is not a severe voting restriction or an example of invidious discrimination, and it is therefore subject to rational basis review." (*Id.* at p. 1007.)

30

straitjacket bind citizens in devising mechanisms of local government suitable for local needs and efficient in solving local problems.' [Citations.] . . . Finally, the rational basis cases do not deal with malapportionment of a general governmental entity resulting in lesser-weighted votes on an individual basis, or with discrete and insular groups foreclosed hopelessly from the political process, or with invidious discrimination." (*Bjornestad*, *supra*, 229 Cal.App.3d at p. 1592.) Even assuming school boards exercise general governmental powers, IRLI does not contend this factor is significant, and every other factor identified by *Bjornestad* applies here.

A federal court of appeals further explained the reason for applying rational basis review in such cases: "Merely expanding the voter rolls is, standing alone, insufficient to make out a claim of vote dilution. The reason for this conclusion can best be illustrated by an example. If a political entity elects to alter its voting requirements, for example by lowering the voting age, it will expand the voting rolls. This dilutes the votes of those already registered to vote. But it does not do so unconstitutionally, even though the state does not have a compelling state interest in lowering the voting age. . . . [¶] To hold otherwise would have either of two effects. It would make any expansion of the voting rolls subject to attack because the state did not have a compelling state interest warranting the change. This would leave the scope of the franchise static and virtually unchangeable. The second alternative is that courts, seeing the potential harm posed by the first, would subvert the compelling state interest test, a critical facet of our constitutional jurisprudence, and leave only the title, but not the substance. Therefore, we conclude that requiring a compelling state interest to justify expanding the franchise is unworkable and inappropriate for this case." (*Duncan v. Coffee County, Tenn.* (6th Cir. 1995) 69 F.3d 88, 94–95 (*Duncan*).) We find the

31

reasoning of the above federal cases persuasive and applicable, and conclude that rational basis review applies to IRLI's vote dilution claim.

IRLI argues that, despite these cases, Proposition N should be reviewed under a strict scrutiny standard because citizenship is a protected class and because voting is a fundamental right. The contentions are unavailing. IRLI cites no authority holding citizens are a protected class, but instead argues they must be because noncitizens are a protected class. Suspect classifications are designated as such because "[t]hese factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others. For these reasons and because such discrimination is unlikely to be soon rectified by legislative means, these laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest." (*City of Cleburne, Tex. v. Cleburne Living Center* (1985) 473 U.S. 432, 440.) The United State Supreme Court held noncitizens "as a class are a prime example of a 'discrete and insular' minority [citation] for whom such heightened judicial solicitude is appropriate." (*Graham v. Richardson* (1971) 403 U.S. 365, 372.) Citizens, as a class, are not a discrete and insular minority, nor is discrimination against citizens unlikely to be soon rectified by legislative means. Indeed, it was an electorate composed solely of citizens that voted in favor of Proposition N, and an electorate composed solely of citizens could again amend the City's charter to prohibit noncitizen voting in school board elections. We see no basis to treat citizens as a class subject to heightened scrutiny.

IRLI's second argument fares no better. The fact that voting is a fundamental right is not sufficient, on its own, to trigger heightened scrutiny.

The United States Supreme Court has held it is an "erroneous assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny. Our cases do not so hold." (*Burdick v. Takushi* (1992) 504 U.S. 428, 432.) As discussed above, numerous lower federal courts have persuasively held vote dilution cases based on an expansion of the franchise are properly reviewed under rational basis review, despite the claimed impact on the right to vote. IRLI makes no attempt to distinguish these cases, which also involved the fundamental right to vote, and we see no basis for such a distinction.

Accordingly, we find rational basis review applies. IRLI does not contend Proposition N cannot survive rational basis review. We agree with the implied concession. In adopting Proposition N, the electorate could reasonably find that extending the franchise to noncitizen parents or guardians of school-age children will increase parental involvement in schools, which will in turn improve educational outcomes. (See *Day, supra*, 693 F.Supp.2d at p. 1007 ["it is perfectly logical for the legislature to grant voting rights to all nonresident property owners in a [community improvement district], not only those nonresidents who reside in Missouri and are U.S. citizens" because of the "effect on property owners of local taxation for public improvements—one of the principal purposes of [community improvement district] creation"]; see also *Duncan, supra*, 69 F.3d at p. 94 ["A decision to include 'out-of district' voters in the election is not irrational if [the government] can show that those voters have a substantial interest in the . . . election"].) We see no basis for a different result under the California Constitution's equal protection clause. (*Jauregui v. City of Palmdale* (2014) 226 Cal.App.4th 781, 800 ["California decisions involving voting issues quite closely follow federal Fourteenth Amendment analysis"].)

33

In a separate argument, amicus curiae Kenneth Blackwell contends Proposition N "could" dilute the voting strength of Black citizens of the City. Blackwell's assertions about the possible dilutive effects of Proposition N are entirely speculative, and he does not contend any such dilution was the intent of voters in adopting Proposition N. Blackwell presents no legal basis to affirm the trial court.

## DISPOSITION

The judgment is reversed and remanded to the trial court with directions to enter a new judgment in favor of the City. The City is awarded its costs on appeal.

SIMONS, Acting P.J.

WE CONCUR:

BURNS, J.
CHOU, J.

*Lacy v. City & County of San Francisco* (A165899)

Trial Court:        City and County of San Francisco Superior Court

Trial Judge:        Hon. Richard B. Ulmer, Jr.

Counsel:            David Chiu, City Attorney, Wayne Snodgrass, and James
                    M. Emery, Deputy City Attorneys for Defendants and
                    Appellants

                    Keker, Van Nest & Peters, R. Adam Lauridsen, Connie P.
                    Sung, and Stephany Martinez Tiffer for Ron Hayduk,
                    Hiroshi Motomura, and Jennifer M. Chacón as Amicus
                    Curiae on behalf of Defendants and Appellants

                    Orrick Herrington & Sutcliffe, Mark S. Davies, Sheila
                    Baynes, Kufere Laing, and John Palmer for Oakland
                    and San Diego Unified School Districts as Amicus
                    Curiae on behalf of Defendants and Appellants

                    ACLU Foundation of Northern California, Angélica
                    Salceda; and ACLU Foundation of Southern California,
                    Julia A. Gomez for Caregiver Organization as Amicus
                    Curiae on behalf of Defendants and Appellants

                    Law Office of Chad D. Morgan, Chad D. Morgan for
                    Plaintiffs and Respondents

                    Public Interest Legal Foundation, J. Christian Adams; and
                    Lex Rex Institute, Alexander Haberbush for J. Kenneth
                    Blackwell as Amicus Curiae on behalf of Plaintiffs and
                    Respondents

                    Immigration Reform Law Institute, Lorraine G. Woodwark
                    as Amicus Curiae on behalf of Plaintiffs and
                    Respondents